IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOAN SCHWAN, et al. | ) | 4:04CV3384 |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CNH AMERICA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This is a "toxic tort" case in which, at last count, 189 plaintiffs assert claims on behalf of 261 individuals (including minors and decedents) against 8 companies for personal injuries, deaths, and property damage allegedly caused by 40 years of pollution at an industrial site in Grand Island, Nebraska, known as the Case New Holland property. Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

Although the action was originally filed on December 16, 2004, it has not advanced beyond the pleading stage. On April 20, 2005, the plaintiffs filed a first amended complaint in response to several motions to dismiss. On July 25, 2005, a second amended complaint was filed pursuant to a stipulation of the parties and with leave of court. Motions to dismiss were again filed pursuant to Federal Rule of Civil 12(b)(6), but were denied without prejudice after the court sua sponte granted the plaintiffs leave to file a third amended complaint to establish that complete diversity of citizenship exists. While not reaching the merits of the Rule 12(b)(6) motions, I cautioned the plaintiffs that the third amended complaint would be "examine[d] very closely [for] the factual basis upon which liability is asserted against each of the defendants." (Memorandum and order entered October 31, 2005 (filing 93), at 8.) I also advised the parties that I was inclined to enter a Lone Pine order[1] to require the

---

[1] Lore v. Lone Pine Corp., No. L 33606-85, 1986 WL 637507 (N.J. Super. Ct. Lav Div., Nov. 18, 1986).

plaintiffs to define their injuries with precision and to produce some evidence of causation prior to any discovery taking place." (Id.)[2]

The plaintiff's third amended complaint was filed on November 21, 2005. It is 162 pages long, and it includes 11 different theories of recovery as against each of the defendants: (1) negligence; (2) negligent failure to warn; (3) negligent infliction of emotional distress; (4) intentional infliction of emotional distress; (5) fraud; (6) fraudulent concealment; (7) battery; (8) trespass to real property; (9) private nuisance; (10) unjust enrichment; and (11) wrongful death.

The matter is before the court on a new round of motions to dismiss. There are four such motions pending, filed by six of the defendants:[3]

- Filing 95, filed by Ford Motor Company
- Filing 97, filed by Unisys Corporation
- Filing 99, filed by CNH America LLC, Fiatallis North America LLC, Case New Holland, Inc., and CNH Global N.V.
- Filing 101, filed by Case New Holland, Inc., Fiatallis North America LLC, and CNH Global N.V.

It will be observed that the three defendants on filing 101 are also on filing 99. Although the motions themselves are uninformative, it appears from the supporting

---

[2] The defendants have since filed a motion for the entry of a Lone Pine order (filing 103). The plaintiffs oppose the motion and have proposed establishing a "test group" of plaintiffs instead (filing 109).

[3] An appearance was previously entered on behalf of the defendant Fiatallis North America, Inc., by the attorneys representing CNH America LLC (see filings 17, 46), but this defendant has not responded to the second or third amended complaints. The plaintiffs allege that Fiatallis North America, Inc., may have converted to Fiatallis North America LLC on November 30, 2004, but they also allege that Fiatallis may still be an active corporation in good standing. (Filing 94, ¶ 7.) In any event, both entities are named as defendants. The other non-moving defendant, Fiat S.p.A., an Italian corporation, was only recently served; with the plaintiffs' consent, it has been allowed until June 13, 2006, to respond to the third amended complaint.

briefs that filing 101 concerns liability issues that do not apply to CNH America LLC, the current operator of the facility. Each motion to dismiss is summarized below.

### Filing 95

The defendant Ford Motor Company is alleged to be a Delaware corporation that has its principal place of business in Michigan. (Filing 94, ¶¶ 11, 20.) The plaintiffs claim that Ford Motor Company "is directly liable for . . . damages, both through its control of the facility and through its contractual agreement to accept liability for certain contaminated areas at the facility, and is also liable for . . . damages through its past alter ego relationship with Ford New Holland, Inc." (Id., ¶¶ 101, 150, 196, 242, 286, 335, 352, 370, 419, 432, 480.) The plaintiffs allege that Ford New Holland, Inc., was formed in 1986 when "Ford Motor Company purchased the Sperry-New Holland agricultural division [from the defendant Unisys Corporation] and then merged it with its own Ford Tractor Operations." (Id., ¶¶ 10, 11.) The plaintiffs further allege that the defendant Fiat S.p.A. acquired 80 percent of Ford New Holland, Inc., in 1991, and the remaining 20 percent in 1993. (Id.)

Ford Motor Company contends (1) that the plaintiffs' pleadings only show that Ford agreed to voluntary remediation activities at a time when its subsidiary, Ford New Holland, Inc., no longer owned the property, and (2) that no facts are alleged to permit "piercing the corporate veil" of its subsidiary. Ford also joins in arguments made by CNH America LLC and Unisys Corporation that "Plaintiffs' claims have numerous incurable defects, including . . . (1) the failure to plead subject matter jurisdiction; (2) the failure to plead any claim that is not barred by Nebraska's statutes of limitations; (2) [sic] the failure to plead fraud and fraudulent concealment with the requisite particularity; (3) [sic] the failure to plead each cause of action against each Defendant, often substituting legal conclusions for required facts, ignoring necessary elements of those causes and lumping Defendants together to hide glaring pleading deficiencies; and (4) [sic] the failure to plead any facts concerning any individual plaintiff." (Filing 96, at 1-2.) I will consider these additional arguments as having

been adopted by reference by Ford, but I do not generally approve of this practice. Although Federal Rule of Civil Procedure 10(c) permits "[s]tatements in a pleading . . . [to] be adopted by reference . . . in any motion," there is no procedural rule that permits statements in briefs to be adopted by reference in other briefs.  See, e.g., Swanson v. United States Forest Service, 87 F.3d 339, 345 (9th Cir. 1996) (district court did not abuse its discretion in striking portions of briefs that incorporated material by reference).  Indeed, our local rules specify that "[a] motion raising a substantial issue of law must be supported by a paginated brief . . . [that] shall state concisely the reasons for the motion and cite the authorities relied upon."  NECivR 7.1(a)(1)(A).

### *Filing 97*

The defendant Unisys Corporation is alleged to be a Delaware corporation that has its principal place of business in Pennsylvania.  (Filing 94, ¶ 10.)  The plaintiffs claim that Unisys is liable "as successor-in-interest to Sperry Rand Corporation" and "is also directly liable . . . through its ownership of the facility, its control of the facility, and through its contractual agreement to accept liability for certain contaminated areas at the facility."  (Id., ¶¶ 102, 151, 197, 243, 287, 336, 353, 371, 420, 433, 481.)  Sperry Rand Corporation allegedly purchased the Case New Holland property in 1965 and began manufacturing agricultural equipment. (Id., ¶ 29.) Sperry Rand Corporation operated the facility until 1986, when it merged with Burroughs Corporation to become Unisys Corporation.  (Id., ¶ 10.)  That same year, Unisys sold its agricultural division to Ford Motor Company.  (Id.)

Unisys argues (1) that all claims against it are barred by applicable statutes of limitation and (2) that the plaintiffs' claims of fraud and fraudulent concealment are not pleaded with particularity, as required by Federal Rule of Civil Procedure 9(b). "Unisys also joins in the entirety of the Motions to Dismiss filed by Defendant CNH America LLC and Defendant Ford Motor Company, and adopts to the extent applicable the arguments made in the Memoranda in Support of those motions."

-4-

(Filing 98, at 5.)   With all due regard, I do not know what this means.  Considering that the plaintiffs' third amended complaint is 162 pages long, and that it contains discrete allegations regarding the activities of each defendant, the court cannot be expected to determine on its own the extent to which one defendant's arguments might be applicable to another defendant.  Even so, I will assume that Unisys would adopt Ford's argument regarding voluntary remediation activities, and would adopt the arguments of CNH America LLC that were identified by Ford.

### Filing 99

The defendant CNH America LLC is alleged to be a Delaware limited liability company that has its principal place of business in Illinois.  (Filing 94, ¶¶ 6, 15.)  Its members allegedly include the defendant Case New Holland, Inc., alleged to be a Delaware corporation that also has its principal place of business in Illinois, and two individuals, Harold Boyanozsky and Michael Lecomte, both of whom are alleged to be Illinois citizens.  (Id., ¶¶ 8, 15, 17.)  The defendant Fiatallis North America LLC is alleged to be a Delaware "limited liability corporation" that has its principal place of business in Delaware, and also a Delaware "limited liability company" that has its principal place of business in Illinois.  (Id., ¶¶ 13, 22.)  To my knowledge, Delaware law does not provide for limited liability corporations.  Thus, I will assume that the latter allegation is correct.  The members of Fiatallis North America LLC are alleged to be CNH America LLC, Harold Boyanozsky, Michael Lecomte, and Roland Sunden, who is alleged to be a citizen of Illinois.  (Id., ¶ 22.)  The defendant  CNH Global N.V. is alleged to be a corporation organized under the laws of the Kingdom of the Netherlands that has its principal place of business in Illinois.  (Id., ¶¶ 9, 18.)

CNH America LLC is alleged to be liable for damages "directly and as successor-in-interest to New Holland North America, Inc., previously known as Ford New Holland, Inc."  (Id., ¶¶ 95, 144, 190, 236, 280, 329, 346, 364, 413, 426, 474.)  The plaintiffs allege that Ford New Holland, Inc., was renamed New Holland North America, Inc., in 1994, after Fiat S.p.A. acquired full ownership of the corporation,

-5-

and that CNH America LLC was formed on January 1, 2004, when New Holland North America, Inc., merged into a company known as Case LLC.  (Id., ¶ 6.)

CNH Global N.V. is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc., and Ford New Holland, Inc." (Id., ¶¶ 99, 148, 194, 240, 284, 333, 350, 368, 417, 430, 478.)  The plaintiffs allege that CNH Global N.V. was formed in 1999 when New Holland N.V. (previously known as N.H. Geotech, a subsidiary of Fiat S.p.A.) merged with Case Corporation; that from 1991 through October 2004, New Holland N.V. owned Fiatallis North America, Inc., which owned New Holland North America, Inc. (previously known as Ford New Holland, Inc.); and that from November 2004 to the present, CNH Global N.V. has owned Case New Holland, Inc.  (Id., ¶ 9.)

Case New Holland, Inc., is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc."  (Id., ¶¶ 98, 147, 193, 239, 283, 332, 349, 367, 416, 429, 477.)  The plaintiffs allege that Fiatallis North America, Inc., transferred all of its interest in CNH America LLC to Case New Holland, Inc., in November 2004.  (Id., ¶ 8.)

Fiatallis North America LLC is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc. and Ford New Holland, Inc." (Id., ¶¶ 97, 146, 192, 238, 282, 331, 348, 366, 415, 428, 476.)  The plaintiffs allege that Fiatallis North America, Inc., was converted to Fiatallis North America LLC on November 30, 2004.  (Id., ¶ 13.)

These four defendants argue (1) that diversity jurisdiction has not been shown to exist because the citizenship of each plaintiff is not properly alleged; (2) that the third amended complaint is defective because it does not contain specific allegations

regarding the claims of each plaintiff against each defendant; (3) that the plaintiffs' claims are time-barred; (4) that each of the 11 theories of recovery is inadequately pleaded; and (5) that damages are not properly alleged.  Additionally, "[t]o the extent applicable, [they] adopt the arguments made by Unisys Corporation and Ford Motor Company."  (Filing 100, at 1.)

### Filing 101

Case New Holland, Inc., Fiatallis North America LLC, and CNH Global N.V. also argue (1) that they have no "alter ego" liability for the conduct of CNH America LLC and its predecessors, and (2) that they cannot be held liable for remediation efforts.  These arguments are similar to those made by Ford Motor Company.

### Plaintiffs' Motion

The plaintiffs have filed a motion for leave to file surreply briefs with respect to each of the motions to dismiss.  (Filing 120.)  Signed copies of the proposed briefs are attached to the motion.  The defendants have submitted briefs in opposition the motion, and although it is not my practice to permit surreply briefs, I do not see that the defendants will be prejudiced if I grant the motion, which I will do instanter (by which I mean that I will consider the briefs that are attached to the plaintiff's motion, without any need for refiling).  For the future, however, I advise the parties that I do not wish to see any more proposed surreply briefs, or, for that matter, any briefs that require leave of court before filing, placed in the court file.

## DISCUSSION

I begin my analysis with the jurisdictional issue, followed by the statute of limitations issues.  I then examine the plaintiffs' claims that are based on "alter ego" relationships and remediation efforts.  I conclude by discussing whether claims are

improperly "lumped together" and whether theories of recovery and damages have been adequately pleaded.

## 1. Subject Matter Jurisdiction

I found the second amended complaint defective because the plaintiffs merely alleged that they were residents of various states, because the citizenship of minors and personal representatives was not alleged, and because the citizenship of members of limited liability company defendants was not alleged.  The plaintiffs have now sufficiently identified the members of CNH America LLC and Fiatallis North America LLC, and it appears that the defendants are citizens of Delaware, Illinois, Michigan, Pennsylvania, Italy, and the Netherlands.  It is also alleged in the third amended complaint that "Plaintiffs suing in their own behalf, minors who are represented by next friends, and personal representative of decedents asserting wrongful death claims are citizens of Nebraska, Tennessee, Colorado, Arizona, Iowa, Missouri, New York, or South Dakota."  (Filing 94, ¶ 14.)  It thus appears that complete diversity of citizenship exists between both sides in the action.

The defendants argue that the plaintiffs should be required to allege their individual addresses, dates of residence, property ownership, and other detailed facts establishing each plaintiff's citizenship.  I conclude that the plaintiffs' allegation is sufficient for pleading subject matter jurisdiction.

## 2. Statute of Limitations

The applicable period of limitations for most tort claims in Nebraska is four years.  See Neb. Rev. Stat. § 25-207.[4]  A discovery rule applies in cases of fraud, see

---

[4]    The following actions can only be brought within four years: (1) An action for trespass upon real property; (2) an action for taking, detaining or injuring personal property, including actions for the specific

Neb. Rev. Stat. § 25-207(4), and "[t]he Nebraska Supreme Court has [also] recognized an equitable tolling of the statute of limitations . . . in certain categories of cases where an injury is not obvious and is neither discovered nor discoverable within the limitations period," Duffy v. Father Flanagan's Boys' Home, No. 8:03CV31, 2006 WL 208832, *3 (D.Neb. Jan. 26, 2006) (citing Shilen v. Board of Regents, 640 N.W.2d 643, 650-51 (Neb. 2002)). The defendants, relying upon former Nebraska law of code pleading,[5] argue that it is incumbent upon the plaintiffs to allege facts showing that their claims are not barred by the 4-year statute of limitations. See, e.g., Nuss v. Alexander, 691 N.W.2d 94, 105 (Neb. 2005) ("A petition which makes apparent on its face that the cause of action it asserts is ostensibly barred by the statute of limitations fails to state a cause of action and is demurrable unless the petition alleges some excuse which tolls the operation and bar of the statute.").

Under federal practice, the statute of limitations is an affirmative defense. See Federal Rule of Civil Procedure 8(c). Even so, a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss when it appears from the face of the complaint itself that the limitation period has run. See Varner v. Peterson Farms, 371 F.3d 1011, 1016 (8th Cir. 2004).

_____

recovery of personal property; (3) an action for an injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated; and (4) an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud, except as provided in sections 30-2206 76-288 to 76-298.

Neb. Rev. Stat. Ann. § 25-207 (LexisNexis 2004). Notwithstanding this general statute of limitations, a wrongful death claim must be brought within 2 years of the date of death. See Neb. Rev. Stat. § 30-810. Also, there is a tolling provision for minors. See Neb. Rev. Stat. § 25-213.

[5] Pursuant to Neb. Rev. Stat. § 25-801.01, the Nebraska Supreme Court has adopted rules of pleading in civil actions which became effective on January 1, 2003.

The plaintiffs argue that the statute of limitations has not run on any of their claims because (1) a discovery rule applies and (2) the continuing tort doctrine applies. Pertinent allegations in this regard include the following:

> 14. Plaintiffs are individuals who are or were residents, landowners, or both, in or around the Property and surrounding area or are individuals who are or were otherwise affected by coming into contact with contamination through exposure to air, water, soil, and/or soil vapors, in or around the Property and the surrounding area or are personal representatives or next friends of individuals who are or were residents, landowners, or both in or around the Property and surrounding area or are individuals who are or were otherwise affected by coming into contact with contamination through exposure to air, water, soil, and/or soil vapors, in or around the Property and the surrounding area.
>
> . . .
>
> 23. Defendants, or other parties known or unknown for whom the Defendants are legally responsible, owned, possessed, operated, maintained, or otherwise held interest in the Case New Holland Property, including, but not limited to, all improvements to said Property and to other contiguous and non-contiguous parcels of land used by the Defendants in operation of said Property at times pertinent hereto.
>
> . . .
>
> 30. A number of different manufacturing processes have taken and are taking place at the Property and at the manufacturing facility located on the Property. These different manufacturing processes use a variety of different chemicals. These manufacturing processes and chemicals include, but are not limited to, the following:
>
> > a)   Press and shear (bending and cutting of steels and other metals,) which uses or has used numerous steel alloys and hydraulic oils;
> >
> > b)   Metals machining, which uses or has used coolants, lubricating oils, hydraulic oils, alkaline cleaners, metal cleaners, degreasers, chlorinated solvents, and non-chlorinated solvents;

    c)     Welding, which uses or has used inert compressed gases, welding wire and rods, and numerous steel alloys;

    d)     Assembly of self-propelled agricultural equipment, including but not limited to combines, bale wagons, and forage harvesters, which uses or has used diesel fuel, engine oil, hydraulic/transmission oils, ethylene glycol, adhesives, sealants, gasketing materials, and aerosol paints;

    e)     Finishing, which is the conversion coating of metal surfaces followed by painting, which uses or has used phosphoric acid, hexavalent chromic acid, sodium metabisulfate, alkaline cleaners, and lime; and

    f)     Associated cleanup processes in conjunction with the aforementioned manufacturing processes.

31. Information from the Nebraska Well Head Protection Authority indicates that the Case New Holland Property is located within the 20-year capture zone of two of Grand Island's municipal drinking water wells located in Stolley State Park, about one mile east of the facility.

32. At times pertinent hereto, Defendants utilized waste disposal methods deleterious to the surrounding community; ignored or violated environmental regulations, including, but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act and the Resource Conservation and Recovery Act; and engaged in other business activities that negatively impacted, and continue to negatively impact, the surrounding community and the environment.

33. Such business activities include, but are not limited to, releasing known contaminants into an unlined pond on the Case New Holland Property; releasing known contaminants into the soil, air, and water sources on or near the Case New Holland Property; storing hazardous materials in environmentally unsafe storage containers; and disposing of waste products in unlined pits on and around the Case New Holland Property.

34. In conducting these unsafe business activities, Defendants placed known contaminants and hazardous substances, including, but not limited to, trichloroethylene (TCE); tetrachloroethylene (PCE or perchloroethylene); 1,1,1-trichloroethane (TCA or methyl chloroform); 1,1 dichloroethane; 1,2 dichloropropane; lead; zinc; chlorothane; copper; napthalene; toluene; xylenes; 1,1 dichloroethene; acetone; antimony; arsenic; barium; beryllium; cadmium; chromium; nickel; and other synthetic and petroleum-derived products, along with their decomposition and breakdown products (hereinafter referred to as the "Contaminants") into Plaintiffs' groundwater, soil, air space, and property, without warning Plaintiffs of the dangers to their health, their property, or the environment. Furthermore, some of these Contaminants are volatile organic chemicals, which are known to vaporize, creating another exposure pathway for Plaintiffs.

35. These Contaminants are known to be toxic to humans, animals, and vegetation.

36. These Contaminants and others not yet known are still infiltrating Plaintiffs' soil, water, and air through discharges into an unlined pond and unlined pits on the Case New Holland Property; through migration of Contaminants from prior discharges into an unlined pond and unlined pits on the Case New Holland Property; through seepage from buried drums filled with Contaminants; and through seepage from the Case New Holland Property's underground storage tanks. This contamination will be ongoing for an indefinite period of time due to seepage and migration from years of dumping Contaminants and contaminated materials on and around the Case New Holland Property.

. . .

52. At all times pertinent hereto, Defendants utilized waste disposal methods deleterious to the surrounding community, ignored or violated environmental regulations, and engaged in other business activities that negatively impacted and polluted, and continue to negatively impact and pollute, the surrounding community and the environment.

53. The Contaminants continuously discharged by Defendants over the last forty years[6] have infiltrated Plaintiffs' air, soil, and water supply, and they continue to spread farther and farther out into the surrounding environment. Plaintiffs have also been exposed to vapors from certain Contaminants. All Defendants have failed to remediate this contamination and have failed to warn Plaintiffs of the harms that exposure to the Contaminants may reasonably cause. Defendants' failure to remediate contamination and failure to warn Plaintiffs of the harms of exposure to Contaminants have been continuous and on-going. All Defendants have been actively negotiating with each other and working together, along with the Nebraska Department of Environmental Quality, on various assessment and characterization efforts at the Property. Furthermore, discharges of Contaminants by all Defendants have been so continuous and intermixed by the natural processes of seepage, aerial dispersion, soil infiltration, water infiltration, and vaporization and failure to remediate such discharges has been so continuous and ongoing that the harm caused by Defendants is not divisible.  Consequently, all Defendants are jointly and severally liable for all consequences of all Defendants' acts.

54. The rate of migration and dispersion of the different Contaminants discharged by Defendants varies tremendously. Different Contaminants migrate and disperse at different rates. Furthermore, the same Contaminant will, at different times, migrate and disperse at different rates depending on many factors, including, but not limited to, the amount of the Contaminant discharged, the method of discharge, the aquifer level, the amount of water being drawn by various wells in the immediate area, meteorological factors, and subsurface topography. A cause of action does not accrue until a Plaintiff suffers a harm. Plaintiffs in this action first suffered harm within the appropriate limitations period preceding the filing of this action. Defendants' actions also constitute an on-going tort because all Defendants have, from the time they either took ownership of the Property or exerted control over the Property, failed to remediate existing contamination and failed to warn

---

[6] The plaintiffs claim that the defendants have "not properly dispos[ed] of Contaminants since 1965 and fail[ed] to remediate Contaminants since 1965." (Filing 94, ¶ 425.)

Plaintiffs of the dangers of exposure to water, soil, and air affected by the discharge of Contaminants at the site. Plaintiffs also first learned or had reason to suspect they were harmed within the appropriate limitations period preceding the filing of this action. As such, Plaintiffs' claims fall within the appropriate statute of limitations period for each claim asserted.

55. Among other business practices and activities, information known to Plaintiffs indicates that Defendants:

a) Intentionally released Contaminants into the soil and water supply by dumping Contaminants into an unlined pond, unlined burial pits, and unlined burn pits on the Case New Holland Property;

b) Continually released Contaminants into an unlined pond, unlined burial pits, and unlined burn pits on the Case New Holland Property that Defendants knew or should have known had seepage problems;

c) Continually ignored leaks and seepage from storage tanks, both above ground and underground;

d) Purposefully misled government officials to believe Defendants were following proper procedures in handling Contaminants;

e) Repeatedly pumped contaminated water and waste into an unlined pond, with the overflow being pumped to the "west field";

f) Periodically buried or burned medical waste on-site along the eastern side of the unlined pond;

g) Emptied sludge, solvents, and waste oils into unlined burial pits;

-14-

h)      Failed to adequately monitor the plume of contamination created by such unsafe practices;

i)      Failed to follow such practices as would prevent the migration of Contaminants offsite; and

j)      Alone, or in concert with others, engaged in one or more of the listed acts or omissions or cover-up of the listed acts or omissions.

(Filing 94, ¶¶ 14, 23, 30-36, 52-55.)

Although the Nebraska Supreme Court has not had occasion to consider whether a discovery rule applies in toxic tort cases, it has stated as a general proposition that it would be "manifestly unjust for the statute of limitations to begin to run before a claimant could reasonably become aware of the injury." Condon v. A. H. Robins Co., Inc., 349 N.W.2d 622, 626 (Neb. 1984) (products liability action) (quoting Hansen v. A. H. Robins, Inc., 335 N.W.2d , 582 (Wis. 1983)). "Discovery, as applied to the statute of limitations, occurs when one knows of the existence of an injury or damage and not when he or she has a legal right to seek redress in court." Andres v. McNeil Co., Inc., 707 N.W.2d 777, 786 (Neb. 2005) (quoting St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co., 507 N.W.2d 275, 281 (Neb. 1993)). "Under the discovery principle, discovery occurs when there has been discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery." Id.   "It is not necessary that the plaintiff have knowledge of the exact nature or source of the problem, but only knowledge that the problem existed." Board of Regents v. Lueder Constr. Co., 433 N.W.2d 485, 491 (Neb. 1988). Cf. Omaha Paper Stock Co., Inc. v. Martin K. Eby Const. Co., Inc., 230 N.W.2d 87, 90 (Neb. 1975) (an action for an injury to the rights of the plaintiff accrues under § 25-207 when the damage occurs and not when the plaintiff discovers the cause of the damage). "[I]n a case where the injury is not obvious and is neither discovered nor discoverable within the limitations period running from the wrongful act or

-15-

omission, the statute of limitations does not begin to run until the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury." Shlien, 640 N.W.2d at 650.

Even if Nebraska law did not provide for the application of a discovery rule in cases such as this, Congress has mandated as part of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) that:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C.A. § 9658 (a)(1) (West 2005). As used in this statute, "the term 'federally required commencement date' means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C.A. § 9658 (b)(4)(A) (West 2005).[7]

The plaintiffs have not directly alleged the dates upon which they claim to have known that they had sustained personal injuries or property damages (applying the Nebraska discovery rule), or that their personal injuries and property damages were caused by contaminants emanating from the Case New Holland property (applying

---

[7] Although the defendants suggest that § 9658 is unconstitutional, its validity has been upheld by the United States Court of Appeals for the Second Circuit. See Frier v. Westinghouse Elec. Corp., 303 F. 3d 176 (2d Cir. 2002) (no violation of commerce clause or tenth amendment), cert. denied, 538 U.S. 998 (2003). The Second Circuit also held that § 9658 applies to wrongful death claims. Id., at 199.

the CERCLA discovery rule).  The plaintiffs merely allege that they "first learned or had reason to suspect they were harmed within the appropriate limitations period preceding the filing of this action."  (Filing 94, ¶ 54.)  A conclusory allegation such as this is unavailing.  See Varner, 371 F.3d at 1016 (district court considering motion to dismiss a claim as time-barred is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.") (quoting Wiles v. Capitol Indem. Corp., 280 F.3d 868, 870 (8th Cir. 2002)).

On the other hand, a Rule 12(b)(6) motion to dismiss a complaint should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief.  See Holden Farms, Inc. v. Hog Slat, Inc., 347 F.3d 1055, 1059 (8th Cir. 2003).  This means as a practical matter that a motion to dismiss should be granted only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief.  See Strand v. Diversified Collection Service, Inc., 380 F.3d 316, 317 (8th Cir. 2004) (stating, however, that the complaint at the very least must contain facts which state a claim as a matter of law and must not be conclusory).  I cannot say that the plaintiffs' pleading shows there is an insuperable time-bar to relief as against any defendant.

In fact, at least insofar as groundwater contamination is concerned, there are allegations in the third amended complaint suggesting that an official determination was not made until 2001 that hazardous substances had migrated from the Case New Holland property.  The plaintiffs allege the following facts regarding environmental assessments conducted on and around the property:

> 76. On information and belief, on or about February 28, 1992, Arthur D. Little, Inc. submitted an "Environmental Baseline Assessment of the Ford New Holland Facility in Grand Island, Nebraska" regarding the Property. This Assessment was prepared on behalf of Fiat S.p.A. and Ford Motor Company. Fiat S.p.A. and Ford Motor Company asked

Arthur D. Little, Inc. to conduct an environmental assessment of "Ford New Holland's Versatile Farm Equipment Operation" located on the Property. This investigation took place on October 1-3, 1991. The purpose of the report was to identify and assess current environmental conditions at the Property and near the Property that could result in current or future liabilities and to develop a "baseline" report that documents those conditions as of the dates of the visits to the Property.

77. On information and belief, on or about July 1, 1993, Fiat S.p.A. and Ford Motor Company asked Arthur D. Little, Inc. to conduct a "Limited Phase 1A Environmental Assessment at the Ford New Holland facility in Grand Island, Nebraska" from February 22, 1993 through April 2, 1993. Arthur D. Little, Inc. recommended that Fiat S.p.A. and Ford Motor Company carefully examine reporting requirements under Federal and Nebraska regulations and guidance regarding chemical releases to the ground water and soil. Arthur D. Little, Inc. also recommended to Fiat S.p.A. and Ford Motor Company that any future work they do at the Property include sufficient monitoring well coverage and soil sampling to define the nature and extent of contamination in the areas of concern identified by Arthur D. Little, Inc. as well as to define ground water flow parameters, such as flow direction, gradient, and hydraulic conductivity.

79. On information and belief, on or about July 29, 1993, NTH Consultants, LTD. prepared a "Bid Document and Technical Specification for Disposal Remediation at the Ford New Holland Facility–Grand Island, Nebraska" for Ford Motor Company.

78. On information and belief, on or about October 13, 1993, Ford Motor Company informed NDEQ that Ford Motor Company would take lead responsibility for two portions of the Ford New Holland, Inc.–Grand Island, Nebraska facility located on the Property where wastes were buried and/or burned. Ford Motor Company told NDEQ that it would investigate and characterize the burial/burn pits on the Property, and, as it learned more about the nature and volume of the wastes, it would be contacting NDEQ for assistance in determining disposal options and cleanup criteria.

-18-

89. On information and belief, on or about November 4, 1993, Fiat S.p.A. submitted to Ford Motor Company Fiat S.p.A.'s comments regarding the "NTH Bid Document and Technical Specification for Disposal Remediation of the Historic, Abandoned Burn and Burial Areas." The original NTH Bid Document was submitted by Ford Motor Company to Fiat S.p.A. on August 9, 1993. The comments demonstrate Fiat S.p.A.'s ongoing negotiations with Ford Motor Company regarding voluntary cleanup of at least part of the Property and the surrounding area.

81. On information and belief, on or about November 19, 1993, Ford Motor Company submitted a remediation plan to the NDEQ for review for remediation at the Ford New Holland Facility–Grand Island, Nebraska located on the Property.

80. On information and belief, on or about December 13, 1993, Ford Motor Company sent a letter to NDEQ telling NDEQ that Ford Motor Company had chosen to take lead responsibility for the cleanup of two areas at the Ford New Holland Facility–Grand Island, Nebraska located on the Property: the Burn pits and the Bury pits.

82. On information and belief, on June 3, 1994, Ford Motor Company again states in a letter to the NDEQ that it is proposing to do a voluntary cleanup of the burn and burial sites located on the Property, consistent with the proposed RCRA Subpart S standards to demonstrate clean closure.

90. On information and belief, on or about September 14, 1995, NDEQ stated that Fiat S.p.A. needed to provide NDEQ with a schedule for the submission of the "Phase II Ground Water Investigation" report. NDEQ also stated that it was the responsibility of Fiat S.p.A. to work with landowners surrounding the facility to gain access to their land for the purpose of installing off-site wells. NDEQ also stated that it views Fiat S.p.A. as the responsible party and that it will continue trying to work with Fiat to conduct remediation at the Property and in the surrounding area on a voluntary basis.

83. On information and belief, on or about October 4, 1995, Dames & Moore, Inc. prepared a "Report on the Establishment of Background Soil Concentrations of Metals and Characterization of the Duck Pond at the New Holland Facility." This October 4, 1995 Report was prepared at the request of Ford Motor Company for the purpose of conducting a site characterization of the Duck Pond located at the New Holland facility on the Property. The primary objectives of the investigation were to establish background soil concentrations for metals at the site and to characterize the sediments and native soil within the Duck Pond as well as the soil around its perimeter and within the adjacent berm.

84. On information and belief, in February 1996, Geraghty & Miller, Inc. prepared a "Phase II Groundwater Investigation Report for the New Holland Facility–Grand Island, Nebraska." Ford Motor Company retained Geraghty & Miller, Inc. to complete a Phase II groundwater investigation at the Property and in the surrounding area. The objectives of the Phase II investigation were to determine the extent of organic and inorganic constituents in the groundwater.

85. On information and belief, on May 30, 1996, in a letter from what appears to be New Holland Ltd., Guyton Giannotta, Environmental Resources Manager for New Holland Ltd., writes NDEQ to confirm a meeting among NDEQ, Unisys Corporation, Ford Motor Company, and Fiat S.p.A. for June 4, 1998, [sic] wherein they planned to discuss the Duck Pond investigation; groundwater investigation; technical issues associated with the burial pit scheduled activities, e.g. burial pit removal plan; health and safety issues; and the long term project outlook. On information and belief, New Holland did not take part in this meeting.

86. On information and belief, Ford Motor Company represented to Nebraska Department of Environmental Control that it was the owner of the Ford New Holland facility located at 3445 W. Stolley Park Road, Grand Island, Nebraska.

88. On information and belief, Ford Motor Company has a contractual agreement with New Holland to assess and remediate contamination associated with specific identified source areas at the

-20-

Property. Ford Motor Company has agreed to conduct detailed assessments of soil and groundwater contamination at the Property and has agreed to remediate the burial area, the burn area, the Duck Pond, and the associated contaminations from those source areas.

70. On information and belief, Unisys Corporation has a contractual agreement with Ford to remediate contamination associated with specific identified source areas on the Property. Unisys Corporation has agreed to remediate the burial area, the burn area, the Duck Pond, and the associated contaminations from those source areas on the Property and surrounding the Property.

71. On information and belief, in a meeting with NDEQ on June 4, 1996, Unisys Corporation stated that it will also conduct a risk assessment with regard to the Property, upon which proposed closure criteria will be developed. Unisys Corporation also stated that it anticipates at least some source removal from the three source areas.

72. On information and belief, on December 6, 1996, Environmental Standards, Inc. submitted a "Baseline Risk Assessment and Development of Risk-Based Cleanup Levels for the New Holland Facility in Grand Island, Nebraska" to Unisys Corporation regarding the Property. Unisys Corporation hired Environmental Standards, Inc. to conduct this investigation and prepare this report.

74. On information and belief, in a letter to NDEQ dated February 27, 1997, Ford Motor Company stated that it has contractual agreements with both Unisys Corporation and Fiat S.p.A. with regard to contamination assessment and remediation at the Grand Island, Nebraska facility located on the Property and the surrounding area.

73. On information and belief, in April 1997, BHE Environmental, Inc. submitted a "Remedial Investigation Work Plan–Waste Delineation New Holland Facility–Grand Island, Nebraska" to Unisys Corporation regarding the Property. Unisys Corporation hired BHE Environmental, Inc. to conduct this investigation and prepare this report.

75. On information and belief, on March 27, 1998, Environmental Standards, Inc. submitted a "Human Health Baseline Risk Assessment and Development of Risk-Based Cleanup Levels for the New Holland Facility in Grand Island, Nebraska" to Unisys Corporation regarding the Property. Unisys Corporation hired Environmental Standards, Inc. to conduct this investigation and prepare this report.

66. On information and belief, on September 6, 2001, Guyton F. Giannotta, a representative of CNH Global N.V., met with NDEQ to discuss the following items:

a)   Historical disposal activities at the CNH Global–Grand Island manufacturing site located on the Property;

b)   Burial area remediation at the CNH Global–Grand Island manufacturing site located on the Property;

c)   Burn area remediation at the CNH Global–Grand Island manufacturing site located on the Property;

d)   Proposed remediation of burial and burn areas at the CNH Global–Grand Island manufacturing site located on the Property;

e)   Duck pond remediation at the CNH Global–Grand Island manufacturing site located on the Property;

f)   Manufacturing building expansion at the CNH Global–Grand Island manufacturing site located on the Property;

g)   Waste disposal or treatment alternatives at the CNH Global–Grand Island manufacturing site located on the Property; and

h)   Future site investigation and remediation activities at the CNH Global–Grand Island manufacturing site located on the Property and in the surrounding area;

-22-

67. On information and belief, on October 9, 2001, the NDEQ sent a letter to Guyton Giannotta of CNH Global N.V. stating the following:

a)  Both public and private drinking water supply wells near the CNH Global–Grand Island manufacturing site located on the Property are contaminated with volatile organic compounds (VOCs) including 1,1,1-trichloroethane; tetrachloroethene; 1,1-dichloroethene; 1,1-dichloroethane; and cis-1,2-dichloroethene, some of which have also been detected in the ground water at the CNH Global–Grand Island manufacturing site located on the Property;

b)  The public and private drinking water supply wells near the CNH Global–Grand Island manufacturing site located on the Property that contain VOCs are down gradient of the CNH Global–Grand Island manufacturing site located on the Property;

c)  NDEQ was expecting a work plan for the removal of buried waste from the CNH Global–Grand Island manufacturing site located on the Property from CNH Global N.V. within thirty (30) days of receipt of the letter;

d)  CNH Global N.V. representatives had previously stated that the burn area was of low risk and should not be excavated but that borings done by NDEQ showed visible contamination, such as sand mixed with sticky, rubbery red yellow, and purple paint and some charred material waste, along with heavy odors;

e)  A request by NDEQ that CNH Global N.V. provide their reports plus additional justification showing why the burn area was of low risk and should not be excavated, such as documents showing the lateral and vertical extent and nature of paint waste contamination in that particular area and the characterization of the contaminants; and

-23-

f)      CNH Global N.V. had previously stated that it did not want to perform verification sampling on contaminated soil in the area but that NDEQ would require this verification sampling to determine the best course of remedial action for the CNH Global–Grand Island manufacturing site located on the Property and the surrounding area.

68. On information and belief, on or about December 4, 2001, the NDEQ sent a letter to Guy Giannotta, a representative of CNH Global N.V. and enclosed with it a draft agreement for CNH Global N.V.'s participation in the Remedial Action Plan Monitoring Act, whereby CNH Global N.V. would agree to voluntarily clean up the CNH Global–Grand Island manufacturing site located on the Property and the surrounding area.

69. On information and belief, in September 2003, Conestoga-Rovers & Associates prepared a "Development of Risk-Based Target Soil Cleanup Levels Interim Removal Action for the New Holland North America, Inc. Facility in Grand Island, Nebraska" for CNH Global N.V. on behalf of New Holland North America, Inc.

63. On information and belief, on or about October 30, 2003, NDEQ sent a letter to Case New Holland, Inc. with NDEQ's comments to the proposed "Private Well Sampling Work Plan, Parkview Subdivision, Stolley Park Area, New Holland North America, Inc. Facility, Grand Island, Nebraska" prepared by Conestoga-Rovers & Associates at the request of Case New Holland, Inc. regarding homes to the east of New Holland North America's Grand Island plant, located on the Property. The negotiations regarding the Work Plan took place between NDEQ and Case New Holland, Inc.

64. On information and belief, in November 2003, Conestoga-Rovers & Associates prepared a final "Private Well Sampling Work Plan, Parkview Subdivision, Stolley Park Area, New Holland North America, Inc. Facility, Grand Island, Nebraska." Case New Holland, Inc. hired Conestoga-Rovers & Associates to conduct this investigation and prepare this document. The Work Plan presents the scope of work for private well sampling and analysis associated with the

-24-

investigations being conducted at the New Holland North America, Inc. manufacturing facility located on the Property and in the surrounding area.

65. On information and belief, on November 6, 2003, the Conestoga-Rovers & Associates' "Private Well Sampling Work Plan, Parkview Subdivision, Stolley Park Area, New Holland North America, Inc. Facility, Grand Island, Nebraska" was submitted to the Nebraska Department of Environmental Quality ("NDEQ") regarding homes to the east of New Holland North America's Grand Island plant located on the Property. Case New Holland, Inc. hired Conestoga-Rovers & Associates to prepare this Work Plan.

(Filing 94, ¶¶ 63-86, 88-90 (reordered chronologically).)

The plaintiffs also allege that the defendants engaged in fraud and fraudulent concealment that prevented the plaintiffs from discovering the existence of their claims. While these allegations are made with respect to theories of recovery, they may also be material to the statute of limitations defense.[8] Thus, the plaintiffs allege:

276. Manufacturing Plant Defendants[9] and Control Defendants[10] made material representations to Fraud Plaintiffs[11] regarding the lack of harm or relative safety of Manufacturing Plant Defendants' and Control

---

[8] The doctrine of fraudulent concealment may render a statute of limitations defense unavailable. Andres v. McNeil Co., Inc., 707 N.W.2d 777, 786 (Neb. 2005).

[9] "Manufacturing Plant Defendants" are Unisys Corporation and CNH America LLC. (Filing 94, ¶ 60.)

[10] "Control Defendants" are all of the defendants except CNH America LLC. (Id., ¶ 62).

[11] "Fraud Plaintiffs" include "Personal Injury Plaintiffs" (identified in paragraph 3 of the third amended complaint) and "Personal Injury and Property Owner Plaintiffs" (identified in paragraph 4 of the third amended complaint). (Id., ¶ 245.)

Defendants business activities, the absence of contamination on or around the Property, and the distribution of Contaminants and other toxic chemicals in ways that harmed Fraud Plaintiffs. Manufacturing Plant Defendants and Control Defendants made these material representations through the manner in which they situated the Case New Holland Property, conducted their business operations, marketed their image to the public, or held themselves out as owners or operators of the Property or of the manufacturing plant located on the Property. Specifically, Manufacturing Plant Defendants and Control Defendants made the following false material representations:

a)   During the Industrial User-Toxics Sampling Inspection on April 30, 1990 through May 3, 1990 conducted by the U.S. Environmental Protection Agency, Region VII, Environmental Services Division at the Ford New Holland facility, Gerry Johnson, a plant engineer for Ford New Holland, Inc. and a participant in the inspection process, represented that the "duck pond" at the facility had been used to collect only non-contact cooling water and storm water run-off prior to discharge to an adjacent field when the "duck pond" was actually used to receive wastewater from the chromating and phosphatizing processes carried on at the Case New Holland Property; and

b)   In September 2003, Jeff Walsh, a company spokesman for CNH, and Jim McBain, the senior director of environmental health and safety for CNH, stated in two separate interviews with Tracy Overstreet, a reporter for the Grand Island Independent, that test results indicated that no Contaminants had left the Case New Holland Property, even though New Holland North America, Inc. had been informed that Contaminants had migrated offsite in February 1996 and in April 2003.

277. These material representations made by Manufacturing Plant Defendants and Control Defendants were false. Manufacturing Plant Defendants and Control Defendants knew that these material

-26-

representations were false, or there was a reckless disregard as to the truth or falsity of the statements.

278. Manufacturing Plant Defendants and Control Defendants intended that Fraud Plaintiffs rely on these false material representations. Fraud Plaintiffs reasonably and justifiably relied on these false material representations. Fraud Plaintiffs based their actions on their reliance of these false material representations. By relying on Manufacturing Plant Defendants' and Control Defendants' false material representations, Fraud Plaintiffs were deprived of the right to make informed decisions regarding their exposure to Contaminants in Fraud Plaintiffs' water, soil, and air.

321. Manufacturing Plant Defendants and Control Defendants concealed or suppressed material facts that they had a duty to disclose to certain government agencies for the benefit of the public regarding the lack of harm or relative safety of their business activities, the absence of contamination on the Case New Holland Property, and the distribution of Contaminants and other toxic chemicals in ways which harmed Fraudulent Concealment Plaintiffs.[12] Specifically, the following concealment of facts were made:

   a)   Manufacturing Plant Defendants and Control Defendants intentionally failed to notify the Environmental Protection Agency of the storage, treatment, or disposal of hazardous waste in the unlined pond, unlined burial pits, or unlined burn pits, as required by the Comprehensive Environmental Response, Compensation, and Liability Act, codified at 42 U.S.C. § 9603(c);

   b)   Manufacturing Plant Defendants and Control Defendants intentionally failed to notify Fraudulent Concealment Plaintiffs and government agencies of a report in February 1992 that informed the Manufacturing Plant Defendant at

---

[12] "Fraudulent Concealment Plaintiffs" are the same as "Fraud Plaintiffs." (Id., ¶ 289.)

-27-

that time that Contaminants from the Case New Holland Property may have migrated offsite;

c)      New Holland North America, Inc. intentionally failed to notify the National Response Center of a release of xylene in an amount in excess of the reportable quantity designated by 40 C.F.R. § 302.4 in the first half of 1999; and

d)      New Holland North America, Inc. intentionally failed to notify the State Emergency Response Commission or the Local Emergency Planning Committee of a release of xylene in an amount in excess of the reportable quantity designated by 40 C.F.R. § 302.4 in the first half of 1999.

322. Manufacturing Plant Defendants and Control Defendants had knowledge of these concealed or suppressed material facts. These concealed or suppressed material facts were not within the reasonably diligent attention, observation, and judgment of the Fraudulent Concealment Plaintiffs.

323. Manufacturing Plant Defendants and Control Defendants concealed or suppressed these material facts with the intention that Fraudulent Concealment Plaintiffs be misled, and Fraudulent Concealment Plaintiffs were reasonably misled.

324. Based upon this suppression or concealment of material facts, Fraudulent Concealment Plaintiffs did not have cause to believe that Contaminants were in Fraudulent Concealment Plaintiffs' water sources, soil, and air.

325. Based upon this suppression or concealment of material facts, Fraudulent Concealment Plaintiffs did not have cause to believe that such Contaminants were harmful to Fraudulent Concealment Plaintiffs.

326. Based upon this suppression or concealment of material facts, Fraudulent Concealment Plaintiffs did not have cause to believe

that their real property would diminish in value when they purchased said property.

    327. Fraudulent Concealment Plaintiffs, reasonably relying on the facts as each perceived them to be as a result of the concealment, acted or withheld action.

(Filing 94, ¶¶ 276-78, 321-27.)

In summary, while there are obvious statute of limitations issues, particularly with respect to Unisys Corporation and Ford Motor Company, which have not had any ownership or alleged "alter ego" interest in the property since 1986 and 1994, respectively, it might be possible for the plaintiffs to prove that they could not reasonably have discovered their claims prior to December 16, 2000 (four years before their action was filed).[13]  I make no determination at this time regarding the applicability of a discovery rule to wrongful death claims, because the matter has not been adequately briefed and no dates of death have even been alleged.

Although the plaintiffs also claim the benefit of the continuing tort doctrine, the Nebraska Supreme Court has only applied the doctrine in professional malpractice cases.  See Casey v. Levine, 621 N.W.2d 482, 487-89 (Neb. 2001) ("continuing treatment" doctrine based on public policy considerations of allowing physician to correct any malpractice and not disrupting the physician-patient relationship); Reinke Mfg. Co., Inc., v. Hayes, 590 N.W.2d 380, 391 (Neb. 1999) (discussing "continuous representation" exception for tolling professional negligence statute of limitations). I do not think Nebraska law would permit tolling of the statute of limitations simply because discharges of contaminants at the Case New Holland property have been "continuous and ongoing."   Neither does it matter that the defendants allegedly have failed to remediate the contamination on a continuous and ongoing basis.  It "makes no sense" to contend that "the statute of limitations would not begin to run in this

---

[13] Claims brought on behalf of minors are not time-barred in any event.

case unless the pollution is actually removed." Highland Indus. Park, Inc. v. BEI Defense Systems Co., 357 F.3d 794, 797 (8th Cir. 2004) (continuing trespass theory would not toll Arkansas statute of limitations).

### 3.  Alter Ego Liability

The plaintiffs claim that Ford Motor Company, CNH Global N.V., and Fiatallis North America LLC, as parent companies, are liable for the conduct of Ford New Holland, Inc. (which operated the facility between 1986 and 1994), and that CNH Global N.V., Case New Holland, Inc., and Fiatallis North America LLC are liable as parent companies for the conduct of New Holland North America, Inc. (which operated the facility between 1994 and 2004), and CNH America LLC (which has operated the facility since 2004).  In each instance, liability is premised on an allegation that the defendants "utilized . . . the subsidiary for a misleading, improper, unjust, fraudulent, or illegal purpose" and "as an agent, instrumentality, adjunct, or alter ego to shield this improper conduct."  (Filing 94, ¶¶ 48, 50.)  It is also alleged that Fiat S.p.A., CNH Global N.V., Case New Holland, Inc., Fiatallis North America LLC, Fiatallis North America, Inc., and CNH America LLC "all engaged in behavior that continually blurred the lines of the independent corporate forms routinely maintained by parent and subsidiary companies . . . [and] acted as one entity rather than as six separate entities." (Id., ¶ 47.)  Fiat S.p.A., CNH Global N.V., Case New Holland, Inc., Fiatallis North America LLC, and Fiatallis North America, Inc., allegedly "took part in controlling the day-to-day operations at the CNH America LLC facility, previously known as the New Holland North America, Inc. facility and the Ford New Holland, Inc. facility, and are now attempting to hide behind the corporate veil to avoid liability stemming from the activities that took place at the facility while . . . [they] were controlling those operations." (Id., ¶ 48.) Their alleged "misleading, improper, unjust, fraudulent, or illegal purpose" was "to conduct business operations with utter disregard for the safety of the residents and/or property owners surrounding the facility."  (Id.)

The defendants argue that Delaware law applies to this issue because the "internal affairs doctrine" recognizes that only one state should have the authority to regulate a corporation's internal affairs.[14]  See Edgar v. MITE Corp., 457 U.S. 624, 645 (1982); Restatement (Second) Conflict of Laws § 302, Comment b, at 307-08 (1971).  "Different conflicts principles apply, however, where the rights of third parties external to the corporation are at issue."  First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 621 (1983) (emphasis in original); Restatement (Second) Conflict of Laws § 301 (1971).

I conclude that "[Nebraska's] interest in applying its law to citizens injured by foreign corporations outweighs the interests of the incorporating state."  See Chrysler Corp. v. Ford Motor Co., 972 F. Supp. 1097, 1103-04 (E.D. Mich. 1997) (state where hazardous substances were released had most significant relationship to issue of alter ego and successor liability) (applying Restatement (Second) Conflict of Laws §§ 301 & 302); AT & T Global Information Solutions Co. v. Union Tank Car Co., 29 F. Supp. 2d 857, 866 (S.D. Ohio 1998) (no tangible interest of Delaware would be promoted by using Delaware law in analyzing plaintiffs' attempt to pierce corporate veil and attach CERCLA liability).  In any event, Ford Motor Company also argues that there is "similarity of the law between the states," and that "since Plaintiffs fail in Delaware they likewise fail in Nebraska."  (Filing 114, at 9.)  The other defendants are deemed to have adopted this argument by reference.  (Filing 119, at 1.)

Under the law of Nebraska, as elsewhere, the shareholders of a corporation generally are not liable for its debts or other obligations. However, "[i]n equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other

---

[14] Although the plaintiffs failed to allege where Ford New Holland, Inc., and New Holland North America, Inc., were incorporated, their brief confirms that these are Delaware corporations.  (Filing 108, at 59.)  The defendant CNH Global N.V. argues that Dutch law applies to it, but it is not CNH Global's corporate veil that the plaintiffs are attempting to pierce.

injustice." U. S. Nat. Bank of Omaha v. Rupe, 296 N.W.2d 474, 477 (Neb. 1980). See also Victory Lake Marine, Inc. v. Velduis, 621 N.W.2d 306, 312 (Neb.App. 2000) (the notion of separate corporate existence of parent and subsidiary or affiliated corporations will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation; the fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote fraud or illegality or injustice); Wolf v. Walt, 530 N.W.2d 890, 896 (Neb. 1995) (a court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another; a corporation's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears); Application of CN Carriers, Inc., 510 N.W.2d 545, 549 (Neb.App. 1993) (under the instrumentality, or alter ego, doctrine, when a corporation is so dominated by another corporation that the subservient corporation becomes a mere instrument and is indistinct from the controlling corporation, the corporate veil of the dominated corporation will be disregarded if it will result in injustice to retain the corporate veil); Carpenter Paper Co. of Nebraska v. Lakin Meat Processors, Inc., 435 N.W.2d 179, 183-84 (Neb. 1989) (when a corporation is or becomes the mere alter ego, or business conduit, of a person, it may be disregarded; the separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors); J.L. Brock Builders, Inc. v. Dahlbeck, 391 N.W.2d 110, 113 (Neb. 1986) (proceedings seeking disregard of corporate entity, that is, piercing the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions); ServiceMaster Industries Inc. v. J.R.L. Enterprises, Inc., 388 N.W.2d 83, 85-86 (Neb. 1986) (when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons); Slusarski v. American Confinement Systems, Inc., 357 N.W.2d 450, 454 (Neb. 1984) (generally, equity will disregard the

corporate entity only if it is used as a cloak to cover fraud or illegality or to work injustice, or if necessary to achieve equity); Nebraska Engineering Co. v. Gerstner, 323 N.W.2d 84, 86 (Neb. 1982) (alter ego theory is equitable doctrine).

"A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights." Global Credit Services, Inc. v. AMISUB (Saint Joseph Hosp.), Inc., 508 N.W.2d 836, 842 (Neb. 1993). "[T]he doctrine of separate corporate existence does not break down merely because a corporation is a subsidiary, even if wholly owned by the parent." Id. "To pierce the corporate veil between a parent and a subsidiary, a plaintiff must show more than the mere sharing of services between the two corporations. Id. The plaintiff "must show that [the parent corporation] totally dominated [the subsidiary corporation] to such extent that [the subsidiary] had no separate corporate existence and functioned solely to achieve the purposes of the dominant corporation." Id.

"Among the factors relevant in determining whether to disregard the corporate entity are grossly inadequate capitalization, insolvency of the debtor corporation at the time the debt is incurred, diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, that the corporation is a mere facade for the personal dealings of the shareholder, and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity." Id. These factors "are not acts of fraud in themselves but, rather, are elements of circumstantial proof of fraud." Southern Lumber & Coal Co. v. M.P. Olson Real Estate and Const. Co., Inc., 426 N.W.2d 504, 509 (Neb. 1988). They are "badges of fraud." Dahlbeck, 391 N.W.2d at 115.

The defendants argue that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to allegations of alter ego liability, but most courts have held otherwise. That is, Rule 9(b) does not apply to piercing allegations except

-33-

to the extent that fraud is alleged as an element.  See Wachovia Securities, LLC v. Neuhauser, No. 04C3082, 2004 WL 2526390, *11 (N.D.Ill. Nov. 5, 2004) (collecting cases); Care Environmental Corp. v. M2 Technologies, Inc., No. CV-05-1600, 2006 WL 148913, *12-13 & n. 13 (E.D.N.Y. Jan. 18, 2006) (veil-piercing claims are generally subject to the pleading requirements imposed by Fed.R.Civ.P. 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief; however, where a veil-piercing claim is based on allegations of fraud, the heightened pleading standard of Rule 9(b) is the lens through which those allegations must be examined); Mayes v. Moore, 1:04CV811, 2006 WL 581026, *3-4 (M.D.N.C. Feb. 16, 2006) (requiring general allegations of injustice or unfairness under Rule 8(a)(2), or specific allegations of fraud under Rule 9(b)).

Although a pleading alleging fraud need not provide anything more than notice of the claim, it must contain "a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." Schaller Telephone Co. v. Golden Sky Systems, Inc., 298 F.3d 736, 746 (8th Cir. 2002) (quoting Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001)).  Thus, a plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." Id.  "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Id. (quoting Commercial Property v. Quality Inns, 61 F.3d 639, 644 (8th Cir.1995)).

Whether the plaintiffs' allegations of fraud and fraudulent concealment contain enough factual details to satisfy the requirements of Rule 9(b) will be examined later in this opinion.  The allegation that the defendants used the facility to conduct business operations with utter disregard to the plaintiffs' safety, especially when considered in conjunction with specific allegations of pollution activities (as also previously set forth in this opinion), satisfies the more lenient pleading requirements of Rule 8(a).

-34-

Concerning the element of domination of the subsidiary by the parent company, I find that the allegations of the third amended complaint are minimally sufficient with respect to CNH Global N.V., Fiatallis North America LLC, and Case New Holland, Inc., insofar as it is claimed that these defendants "blurred the lines of the independent corporate forms" and "controll[ed] the day-to-day operations" at the manufacturing facility.[15]  On the other hand, I find no allegation that Ford Motor Company exercised improper control over Ford New Holland, Inc.—I only find conclusory statements that Ford New Holland, Inc., was Ford's alter ego.  Ford's motion to dismiss therefore will be granted with respect to this issue.

Because this claim of alter ego liability has not previously been dismissed, I will allow the plaintiffs an opportunity to amend their complaint, consistent with the pleading constraints of Federal Rule of Civil Procedure 11(b), to allege that Ford Motor Company also disregarded corporate formalities and controlled day-to-day operations at the Ford New Holland, Inc. facility (or to allege some other "badge of

---

[15] For whatever reason, the parties have failed to discuss two rather important issues concerning alter ego liability.  The first issue is whether a direct ownership interest is required.  In this case, for example, it is alleged that CNH Global N.V. owns Case New Holland, Inc., which is a member of CNH America LLC.  Can CNH Global N.V. be held liable for the actions of CNH America LLC without also piercing the corporate veil of Case New Holland, Inc.?  I will assume, without deciding, that such a result is possible.  See e.g., In re Buckhead America Corp., 178 B.R. 956, 974-75 (D.Del. 1994) (discussing alter ego liability of parent's parent company).  The second overlooked issue is whether principles of corporate veil piercing apply to a limited liability company, such as CNH America LLC.  Again, I will assume for the time being that they do.  See, e.g., Filo America, Inc. v. Olhoss Trading Co., L.L.C. 321 F. Supp. 2d 1266, 1269-70 (M.D. Ala. 2004) (commentators who have discussed the issue as a nationwide matter have concluded that the "veil-piercing" doctrine applies to LLCs, and several courts have held that it does) (collecting authorities); In re Giampietro, 317 B.R. 841, 847-48 & n. 9, 10 (Bkrtcy. D.Nev. 2004) (citing authorities for proposition that tests are the same for piercing the veil in a corporate or limited liability context, while noting that failure to observe organizational formalities may not to be a factor in alter ego liability of LLC members under certain circumstances).

fraud" under Nebraska law). In this regard, I caution the plaintiffs that Ford's alleged actions in contracting with environmental consulting companies, contracting with Unisys Corporation to assume liability for contaminated areas at the Case New Holland property, or negotiating with other defendants or the Nebraska Department of Environmental Quality regarding pollution remediation efforts [16] do not provide "evidentiary support" for an allegation that Ford disregarded its subsidiary's separate corporate existence and controlled day-to-day operations at the facility, nor do such actions reasonably support an inference that evidentiary support for the allegation is likely to be obtained "after a reasonable opportunity for further investigation or discovery." See Fed. R. Civ. P. 11(b)(3). To put the matter plainly, if the plaintiffs have no other reason for alleging that Ford New Holland, Inc., was the alter ego of Ford Motor Company, they should not file a fourth amended complaint. [17]

### 4. Liability for Remediation Efforts

The plaintiffs claim that all defendants except CNH America LLC "took actions consistent with the types of actions that would normally be taken by the direct owner and direct controller of the facility at Case New Holland Property." (Filing 94, ¶¶ 42, 43, 44, 45, 46, 49, 51.) In the case of CNH Global N.V., "[t]hese actions include, but are not limited to, contracting with various environmental consulting companies for those companies to perform monitoring and assessments of the Property; negotiating with the Nebraska Department of Environmental Quality on behalf of New Holland North America, Inc.; actively participating in the drafting of a Remedial Action Plan Monitoring Act agreement between New Holland North America, Inc. and the Nebraska Department of Environmental Quality; and actively negotiating with and coordinating with Defendants Unisys Corporation, Ford Motor

---

[16] See the discussion which immediately follows.

[17] If a fourth amended complaint is not filed, however, I will enter a final judgment dismissing Ford Motor Company as a party pursuant to Federal Rule of Civil Procedure 54(b).

Company, Fiat S.p.A., Fiatallis North America, Inc., Fiatallis North America LLC f/k/a Fiatallis North America, Inc., and New Holland North America, Inc. and with the Nebraska Department of Environmental Quality regarding characterization of contaminants at the Property and remediation of those contaminants." (Id., ¶ 42.) Case New Holland, Inc., Ford Motor Company, and Unisys Corporation, among other things, allegedly "contract[ed] with various environmental consulting companies for those companies to perform monitoring and assessments of the Property and actively negotiat[ed] with and coordinat[ed] with . . . [the other defendants] and with the Nebraska Department of Environmental Quality regarding characterization of contaminants at the Property and remediation of those contaminants." (Id., ¶¶ 44, 49, 51.) Fiatallis North America, Inc., and Fiatallis North America LLC, are not alleged to have contracted with environmental consulting companies, but, among other things, they allegedly "actively negotiat[ed] with and coordinat[ed] with . . . [the other defendants] and with the Nebraska Department of Environmental Quality regarding characterization of contaminants at the Property and remediation of those contaminants." (Id., ¶ 45, 46.)

It is further alleged on information and belief that "Ford Motor Company has contractually agreed to be liable for two areas at the facility—the burn pits and the burial pits—and for remediation of contamination resulting from those two areas[,]" and "has also made affirmative representations to the Nebraska Department of Environmental Quality that it will be liable for the burn pits and burial pits at the facility." (Id., ¶ 49.) Ford allegedly stated in a letter to the NDEQ on February 27, 1997, that "it has contractual agreements with both Unisys Corporation and Fiat S.p.A. with regard to contamination assessment and remediation at the Grand Island, Nebraska facility located on the Property and the surrounding area." (Id., ¶¶ 74, 87, 119, 132, 168, 181, 214, 227, 259, 272, 303, 316, 388, 401, 451, 464.) Also, Ford allegedly "has a contractual agreement with New Holland to assess and remediate contamination associated with specific identified source areas at the Property." (Id., ¶¶ 88, 133, 182, 228, 273, 317, 402, 465.) Specifically, Ford "has agreed to conduct detailed assessments of soil and groundwater contamination at the Property and has

agreed to remediate the burial area, the burn area, the Duck Pond, and the associated contaminations from those source areas." (Id.) Similarly, it is alleged on information and belief that "Unisys Corporation has a contractual agreement with Ford to remediate contamination associated with specific identified source areas on the Property[,]" and "has agreed to remediate the burial area, the burn area, the Duck Pond, and the associated contaminations from those source areas on the Property and surrounding the Property." (Id., ¶¶ 70, 115, 164, 210, 255, 299, 384, 447.)

The plaintiffs have cited no authority for the proposition that the defendants may be held liable in tort simply because they hired experts to monitor and assess pollution, negotiated among themselves and with the NDEQ concerning remediation efforts, or contracted with each other to assume liability for certain portions of the property. These actions may be "consistent with the types of actions that would normally be taken by the direct owner and direct controller of the facility," but it does not follow that by taking such actions the defendants became de facto owners or controllers of the facility. Thus, to the extent that the plaintiffs seek to impose liability upon Fiatallis North America, Inc., Case New Holland, Inc., CNH Global N.V., Unisys Corporation, Ford Motor Company, and Fiatallis North America LLC as "Control Defendants," their claims will be dismissed.[18]

---

[18] The "Control Defendants" allegedly "all participated directly in controlling and performing the day-to-day operations at the Property and/or represented themselves as the entity in control of the Property or of operations taking place at the Property." (Filing 94, ¶ 62.) I construe this allegation of "controlling and performing the day-to-day operations" as pertaining only to the claimed liability for remediation efforts, as opposed to alter ego liability. It is also distinct from owner liability, which provides the basis for the plaintiffs' claims against the "Manufacturing Plant Defendants," namely, "Unisys Corporation, successor-in-interest to Sperry Rand Corporation, and . . . CNH America LLC, successor-in-interest to New Holland North America, Inc. p/k/a Ford New Holland, Inc." (Id., ¶ 60.) Allegations made against "Manufacturing Plant Defendants" that are alleged to be the alter egos of other defendants also apply to such other defendants.

The plaintiffs also allege repeatedly that Ford Motor Company and Unisys Corporation are directly liable "through [their] control of the facility and through [their] contractual agreement to accept liability for certain contaminated areas at the facility." Regarding the alleged assumption of liability by Ford and Unisys, it is well-established that "in order for those not named as parties to a contract to recover thereunder as third-party beneficiaries, it must appear by express stipulation or by reasonable intendment that the rights and interests of such unnamed parties were contemplated and that provision was being made for them." Molina v. American Alternative Ins. Corp., 699 N.W.2d 415, 419 (Neb. 2005). The test is whether the parties to the contract intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental. Spring Valley IV Joint Venture v. Nebraska State Bank of Omaha, 690 N.W.2d 778, 782 (Neb. 2005). Because the plaintiffs do not allege that they have third-party beneficiary status, their claims made against Ford and Unisys on a contract liability theory are also dismissed.

Consistent with the foregoing rulings, the following paragraphs of the third amended complaint, pertaining solely to "Control Defendants," will be stricken in their entirety: Paragraphs 62, 91, 92, 107, 136, 137, 156, 185, 186, 202, 231, 232, 247, 291, 376, 405, 406, 439, 468, and 469. In addition, all references to "Control Defendants" in the following paragraphs of the third amended complaint will be stricken: Paragraphs 93, 94, 138, 139, 140, 141, 142, 143, 187, 188, 189, 233, 234, 235, 246, 276, 277, 278, 279, 290, 320, 321, 322, 323, 328, 341, 342, 343, 344, 345, 359, 360, 407, 408, 409, 410, 411, 412, 423, 424, 425, 470, 471, 472, and 473.

The following paragraphs alleging liability on the part of Ford Motor Company (based on eleven different theories of recovery) because of its remediation efforts, its alleged assumption of liability by contract, or its alter ego liability will be stricken: Paragraphs 101, 150, 196, 242, 286, 335, 352, 370, 419, 432, and 480. General allegations that Ford is liable for these same reasons will also be stricken, namely: Paragraphs 49 and 50. If the plaintiffs file a fourth amended complaint to supply a factual basis for imposing alter ego liability on Ford, they may re-allege paragraph

50 and, as to each theory of recovery, may re-allege their conclusion that Ford is "liable for [the plaintiffs'] damages through its past alter ego relationship with Ford New Holland, Inc." (Paragraphs 101, 150, 196, 242, 286, 335, 352, 370, 419, 432, and 480.)  However, the plaintiffs shall <u>not</u> re-allege paragraph 49 or the conclusory statements that Ford is liable for the plaintiffs' damages under each theory of recovery "through its control of the facility and through its contractual agreement to accept liability for certain contaminated areas at the facility."  (<u>Id.</u>)

Similarly, the following paragraph of third amended complaint, generally alleging that Unisys Corporation is liable to the plaintiffs because of remediation efforts or contractual liability, will be stricken: Paragraph 51.  Allegations claiming that Unisys is directly liable through "its control of the facility, and through its contractual agreement to accept liability for certain contaminated areas at the facility," will also be stricken from the following paragraphs: Paragraphs 102, 151, 197, 243, 287, 336, 353, 371, 420, 433, and 481.  The allegations in these eleven paragraphs that Unisys is directly liable as a successor-in-interest to Sperry Rand Corporation and as an owner of the property will not be stricken.

### 5.  *Joinder of Claims*

The defendants once again complain that the plaintiffs' claims should not all be "lumped together."  It remains my view that the claims are properly joined under Federal Rule of Civil Procedure 20(a), provided that sufficient facts are alleged to establish the liability of each defendant for some personal injury, property damage, or wrongful death associated with the alleged spread of contaminants from the Case New Holland property.  <u>See</u> <u>Mosley v. General Motors Corp.</u>, 497 F.2d 1330, 1332-34 (8th Cir. 1974) (single trials tend to lessen the delay, expense, and inconvenience to all concerned; prerequisites to joinder are: (1) a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising out of the same transaction or occurrence, or series of transactions or occurrences; and (2) some question of law or fact common to all the parties must arise in the action).  The sufficiency of those

fact allegations will be examined next, but before proceeding with this analysis of the plaintiff's various theories of recovery, I will summarize my rulings to this point.

As previously set forth, the plaintiffs alleged that Ford is liable "both through its control of the facility and through its contractual agreement to accept liability for certain contaminated areas at the facility," and "through its past alter ego relationship with Ford New Holland, Inc." I have ruled that Ford has no liability for directing remediation efforts or contracting with other defendants. I have also ruled that Ford has no alter ego liability based on the actions of its subsidiary because the plaintiffs have not alleged a factual basis for piercing the corporate veil of Ford New Holland, Inc. Unless the plaintiffs promptly file a fourth amended complaint to correct this pleading defect, a final judgment will be entered dismissing Ford Motor Company as a party defendant.

The plaintiffs allege that Unisys Corporation is liable "as successor-in-interest to Sperry Rand Corporation" and "through its ownership of the facility, its control of the facility, and through its contractual agreement to accept liability for certain contaminated areas at the facility." I have ruled that Unisys Corporation also has no tort or contract liability to the plaintiffs for any remediation efforts. It is not alleged to have any alter ego liability. Unisys does not dispute that it might be held liable as Sperry Rand's successor-in-interest or as an owner of the property.

CNH America LLC is alleged to be liable for damages "directly and as successor-in-interest to New Holland North America, Inc., previously known as Ford New Holland, Inc." My rulings thus far have not eliminated these claims.

CNH Global N.V. is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc., and Ford New Holland, Inc." I have ruled that CNH Global N.V. has no direct liability based on its alleged control of remediation efforts, but that it may have alter ego liability.

-41-

Case New Holland, Inc., is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc." Again, I have ruled that Case New Holland, Inc., has no direct liability for control of remediation efforts, but that it may have alter ego liability.

Finally, Fiatallis North America LLC is alleged to be liable for damages "directly and through its current alter ego relationship with CNH America LLC and its past alter ego relationship with New Holland North America, Inc. and Ford New Holland, Inc." I have also ruled that Case  New Holland, Inc., has no direct liability for control of remediation efforts, but that it may have alter ego liability.

In summary, Unisys Corporation and CNH America may be liable as owners of the property and as successors-in-interest to previous owners. The potential liability of Unisys covers the period from 1965, when its predecessor-in-interest, Sperry Rand Corporation, commenced manufacturing operations, until 1986, when the property was sold to Ford Motor Company. CNH America LLC may be liable for operations at the facility since 1986 as successor-in-interest to New Holland North America, Inc., and Ford New Holland, Inc., and as the current owner of the property. CNH Global N.V., Case New Holland, Inc., and Fiatallis North America LLC may face to alter ego liability for various time periods since 1986. Ford Motor Company is not liable in any capacity.

### 6.  Theories of Recovery

Federal Rule of Civil Procedure 8(a) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." The essential function of notice pleading "is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." Northern States Power Co. v. Federal Transit Admin., 358 F.3d 1050, 1056-57 (8th Cir. 2004) (quoting Oglala Sioux Tribe of Indians v. Andrus, 603

F.2d 707, 714 (8th Cir.1979)).   The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules.  Parkhill v. Minnesota Mut. Life Ins. Co., 286 F.3d 1051, 1057-58 (8th Cir. 2002).  "Complaints need not spell out every element of a legal theory; that's the big difference between notice and code pleading."  Dohmen v. Twin Rivers Public Schools, 207 F.Supp.2d 972, 990-91 (D.Neb. 2002) (quoting Hemenway v. Peabody Coal Co., 159 F.3d 255, 261 (7th Cir.1998).

A claim must be presented "with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search" of the pleader's claims.  See Iowa Health System v. Trinity Health Corp., 177 F. Supp. 2d 897, 905 (N.D.Iowa 2001) (quoting Jennings v. Emry, 910 F.2d 1434, 1436 (7th Cir.1990)).  Thus, Rule 8(e)(1) requires simplicity and clarity, generally, while Rules 8(e)(2) and 10(b) explain the requirements for pleading alternative theories and separate claims.  Id.  Federal Rule of Civil Procedure 8(e)(2) allows a party to set forth two or more statements of a claim in one count, while Rule 10(b) requires that each claim founded upon a separate transaction or occurrence be stated in a separate count "whenever a separation facilitates a clear presentation of the matters set forth."

In this case, the plaintiffs' complaint has ballooned to 162 pages as a result of unnecessary repetition.  In effect, the plaintiffs' treat their 11 theories of recovery as claims (or, if you will, "causes of action") and allege each theory as a separate count. This is at odds with modern federal pleading practice.  See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure ("Wright & Miller") § 1219, at 277-78 (3d ed. 2004) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief.").  While pleading theories of recovery as separate

counts is not strictly prohibited by the Federal Rules,[19] the third amended complaint is overly long and confusing because the plaintiffs have repeated allegations in each count rather than incorporating by reference, as permitted by Federal Rule of Civil Procedure 10(c).  To simplify matters somewhat, I will be striking many of these redundant allegations on my own initiative, pursuant to Federal Rule of Civil Procedure 12(f).

### a.  Negligence

The plaintiffs allege that the "Manufacturing Plant Defendants" (i.e., Unisys Corporation, in its own right and as successor-in-interest to Sperry Rand Corporation, and CNH America, LLC, in its own right and as successor-in-interest to New Holland North America, Inc., previously known as Ford New Holland, Inc.),[20] breached their duties to the plaintiffs, and were negligent, in:

> a) Failing to take appropriate measures to ensure a safe method of disposal of their waste products;
>
> b) Dumping Contaminants into an unlined pond and unlined pits on the Case New Holland Property;
>
> c) Failing to prevent the migration of Contaminants from the Property into Negligence Plaintiffs' water, soil, and air;

---

[19] See 5A Wright & Miller § 1324, at 402 ("Rule 8(e)(2) permits a single claim to be stated in different counts at the option of the pleader.") and 405-06 ("Rule 10(b) does not make it necessary to use separate counts to state different theories of recovery . . ., although the pleader may choose to do so for clarity or out of caution.").

[20] As previously discussed, CNH Global N.V., Case New Holland, Inc., and Fiatallis North America LLC can be considered "Manufacturing Plant Defendants" to the extent that CNH America, LLC, New Holland North America, Inc., and Ford New Holland, Inc., were acting as their alter egos.

d) Failing to take steps necessary to remediate existing contamination on the Property to prevent the Contaminants from migrating into Negligence Plaintiffs' water, soil, and air;

e) Failing to take steps necessary to remediate the existing contamination in Negligence Plaintiffs' water, soil, and air that stems from the migration of Contaminants from the Property into said water, soil, and air;

f) Failing to maintain underground and above-ground storage tanks so as to prevent leaks from occurring;

g) Failing to advise Negligence Plaintiffs of the harmful effects of coming into contact with water, soil, and air affected by the migration of Contaminants from the Property;

h) Failing to provide Negligence Plaintiffs with adequate alternative sources of water;

i) Engaging in the unpermitted burning of waste on the Property; or

j) Failing to accurately report all environmentally relevant information in accordance with local, state, and federal rules, statutes, or regulations applicable to each Manufacturing Plant Defendant either during or subsequent to its period of operation, including, but not limited to, all test results from tests on water, soil, sediment, or air from the Property and all leaks occurring on the Property to the proper government agency or agencies.

(Filing 94, ¶ 61.)  The plaintiffs also allege that the defendants' conduct "was and is the direct and proximate cause of [the plaintiffs'] damages, including but not limited to, physical pain and suffering, mental anguish, disabilities, mental health issues, economic damages, and property damage."  (Id., ¶ 94.)

The defendants do not take issue with these specifications of negligence,[21] except to argue that they should be geared to damage claims made by particular plaintiffs against particular defendants. While I agree that the defendants are entitled to receive certain information from each plaintiff,[22] I conclude that enough information has been provided to permit the defendants to answer the "negligence" count. That is, I find that the third amended complaint sufficiently states a claim upon which relief can be granted on a negligence theory of recovery.

### b. Negligent Failure to Warn

The plaintiffs next contend that the defendants were negligent in failing to warn them of the contamination. Paragraphs 105 through 137 are substantially the same as paragraphs 60 through 92 of the "negligence" count, and will be stricken as redundant.[23]

---

[21] Specifications of negligence need not be pleaded in federal court. See Chicago & N.W. Ry. Co. v. Rieger, 326 F.2d 329, 336 (8th Cir. 1964).

[22] In general, "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f) [of the Federal Rules of Civil Procedure]." Fed. R. Civ. P. 26(d). Also, initial disclosures of potential witnesses, exhibits, and damage computations generally are not required to be made until after the Rule 26(f) conference. See Fed. R. Civ. P. 26(a). In this case, the parties filed joint motions to postpone the Rule 26(f) conference until after the court ruled on motions to dismiss, and such joint motions were granted by Magistrate Judge Piester. (Filings 42, 44, 76, 77.) When I ordered the plaintiffs to file a third amended complaint, I also denied the defendants' motions to dismiss without prejudice and continued indefinitely the parties' deadline for filing a Rule 26(f) report. (Filing 93.) Now, in conjunction with my ruling on the defendants' motions to dismiss the third amended complaint, I am entering a separate order granting the defendants' motion for entry of a Lone Pine case management order (filing 103) and establishing a new deadline for the parties to file a Rule 26(f) report.

[23] Paragraphs 60, 61, and 63 through 90 are deemed to be incorporated by reference into the "negligent failure to warn" count. (Paragraphs 62, 91, and 92 will be stricken for reasons previously stated.)

In the remainder of this "negligent failure to warn" count, the plaintiffs allege that the defendants "knew or should have known [(1)] that they were expelling Contaminants into [the plaintiffs'] water, soil, and air, which is likely to be dangerous to [the plaintiffs] in the vicinity of the Property or that Contaminants were being expelled[;]" (2) "that Contaminants that were dumped into the unlined pond or unlined pits on the Property would migrate and would contaminate [the plaintiffs'] soil, air, and water, which is likely to be dangerous to [the plaintiffs] in the vicinity of the Property[;]" and (3) "that they were performing an act or engaging in an operation that is likely to be dangerous to persons in the vicinity; as such, it was [the defendants'] duty to warn [the plaintiffs] of such danger. (¶¶ 138, 139, 140.) The plaintiffs also allege that the defendants "breached their duty to warn by [(1)] failing to appropriately advise [the plaintiffs] of the discharge of the Contaminants into [the plaintiffs'] water, soil, and air; [(2)] by failing to appropriately advise [the plaintiffs] of the migration of Contaminants from the Property into [the plaintiffs'] water, soil, and air; and [(3)] by failing to advise [the plaintiffs] of the harmful effects of coming into contact with water, soil, and air affected by the Contaminants." (¶ 141.) Finally, the plaintiffs allege that the defendants "knew or should have known that [their] failure to warn would harm, and would continue to harm, [the plaintiffs]," and that "[the defendant's] conduct was and is the direct and proximate cause of [the plaintiffs'] damages, including but not limited to, physical pain and suffering, mental anguish, disabilities, mental health issues, economic damages, or property damage. (¶¶ 142, 143.)

These allegations add nothing of substance to the plaintiffs' charge that the defendants were negligent in "[f]ailing to advise [the plaintiffs] of the harmful effects of coming into contact with water, soil, and air affected by the migration of Contaminants from the Property," as previously alleged in paragraph 61(g) of the third amended complaint. The claimed damages are also the same. Even so, the plaintiffs are not wrong in treating "negligent failure to warn" as a distinct theory of recovery. See, e.g., Freeman v. Hoffman-LaRoche, Inc., 618 N.W.2d 827, 832 (Neb.

2000) (product liability claim); <u>Hobbs v. Midwest Ins., Inc.</u>, 570 N.W.2d 525, 528 (Neb. 1997) (claim against plaintiff's insurance agent).

The defendants suggest that a duty to warn does not exist under Nebraska law absent a special relationship, citing <u>Popple v. Rose</u>, 573 N.W.2d 765, 770 (Neb. 1998) and <u>Turner v. Fehrs Nebraska Tractor & Equip. Co.</u>, 609 N.W.2d 652, 658 (Neb. 2000), but it appears that the plaintiffs have sufficiently alleged such a relationship in this case, based on the defendants' alleged knowledge that they were exposing the plaintiffs to harmful chemicals. As stated in <u>Restatement (Second) of Torts</u> § 321 (1965): "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect."

### c. *Negligent Infliction of Emotional Distress*

Further expanding upon their negligence claim, the plaintiffs allege that they suffered emotional distress. Again, paragraphs 154 through 186 are indistinguishable from paragraphs 60 through 92 of the basic "negligence" count, and will be stricken.[24]

The only new allegations concern the plaintiffs' injuries, as it is alleged that "[a]s a direct and proximate cause of [the defendants'] conduct, [the plaintiffs] are emotionally distressed by the injuries sustained either by themselves or by individuals with whom [the plaintiffs] share an intimate familial relationship [and] . . .by the reasonable fear of the known and unknown consequences to the health or mental abilities of either themselves or of individuals with whom [the plaintiffs] share an intimate familial relationship." (Filing 94, ¶ 188.) The plaintiffs allege that the emotional distress "has manifested itself through medically significant injuries evidenced by objective, physical symptomology that is medically diagnosable," and "is so severe that no reasonable person could be expected to endure it." (<u>Id.</u>, ¶ 189.)

---

[24] Paragraphs 60, 61, and 63 through 90 are deemed to be incorporated by reference into  the "negligent infliction of emotional distress" count.

The defendants, citing <u>Fackler v. Genetsky</u>, 595 N.W.2d 884, 891 (Neb. 1999), argue that "[u]nder Nebraska law, an emotional distress claim consisting of the same underlying facts giving rights to relief as a negligence cause of action is not a separate cause of action, but rather a separate theory of recovery or element of damages." (Filing 100, at 16.)  While this may be an accurate statement of Nebraska law as it existed under code pleading, it hardly matters in this case.  As previously discussed, it is permissible under the Federal Rules to plead theories of recovery as separate counts of a complaint (although theories of recovery need not be pleaded at all).  Also, to the extent that emotional distress may be an element of damages for a negligence "cause of action" in Nebraska, the plaintiffs have already alleged in count one of the third amended complaint that they suffered "mental anguish" and "mental health issues."

In Nebraska, where there is no impact or physical injury to the plaintiff, the plaintiff seeking to bring an action for negligent infliction of emotional distress must show either (1) that he or she is a reasonably foreseeable "bystander" victim based upon an intimate familial relationship with a seriously injured victim of the defendant's negligence or (2) that the plaintiff was a "direct victim" of the defendant's negligence because the plaintiff was within the zone of danger of the negligence in question.  <u>Catron v. Lewis</u>, 271 Neb. 416, ___ N.W.2d ___, 2006 WL 958736, *4 (Neb. Apr. 14, 2006).  In addition, such plaintiffs whose only injury is an emotional one must show that their emotional distress is medically diagnosable and significant and is so severe that no reasonable person could have expected to endure it.  <u>Id.</u>  Nebraska law also permits the recovery of "parasitic damages," which are damages occasioned by anxiety specifically due to a reasonable fear of future harm attributable to a physical injury caused by the negligence of another.  <u>Hamilton v. Nestor</u>, 659 N.W.2d 321, 324-25 (Neb. 2003) (citing <u>Hartwig v. Oregon Trail Eye Clinic</u>, 580 N.W.2d 86 (1998).

The third amended complaint is short on facts regarding the plaintiffs' alleged emotional distress, and, for that matter, all of the plaintiffs' claimed injuries, but this

is an unusual case simply because of the large number of individual claims that are involved. It is doubtful that requiring more factual detail would make any difference to the defendants in answering the complaint, but it certainly would delay the case and make the pleadings even bulkier and more difficult to slog through. Whether each plaintiff, each represented minor, and each plaintiff's decedent in fact suffered from emotional distress that "manifested itself through medically significant injuries evidenced by objective, physical symptomology that is medically diagnosable" is easily discoverable and is an issue that can be resolved on a motion for summary judgment.[25]

### d. Intentional Infliction of Emotional Distress

The elements of the tort of intentional infliction of emotional distress, sometimes referred to as the tort of outrage, are (1) that there has been intentional or reckless conduct, (2) that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. Kant v. Altayar, 704 N.W.2d 537, 540 (Neb. 2005). Under this theory of recovery, "outrageous" conduct is actionable "only where the emotional distress has in fact resulted, and where it is severe." Id. (quoting Restatement (Second) of Torts § 46, comment j. at 77 (1965)).

---

[25] As hinted at in my previous memorandum and order (filing 93, at 9), Federal Rule of Civil Procedure 11(b)(3) required the plaintiffs' attorneys to ascertain that there is evidentiary support for all allegations made in the third amended complaint (or, if appropriate, to identify allegations that are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery). If medical evidence does not exist to support an emotional distress claim for every plaintiff, minor, and decedent, the defendants may also move for the imposition of sanctions unless the claims are voluntarily withdrawn.

The plaintiffs parrot these elements in their "intentional infliction of emotional distress" count by alleging (1) that "[the defendants'] actions or omissions were and are intentional or reckless[;]" (2) that "[the defendants'] conduct was and is so outrageous and so extreme that the conduct goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community[;]" and (3) that "as a direct and proximate cause of [the defendants'] conduct, [the plaintiffs] have suffered damages in the form of emotional distress that has manifested itself through medically significant injuries evidenced by objective, physical symptomology that is medically diagnosable . . . [and that] is so severe that no reasonable person could be expected to endure it." (Filing 94, ¶¶ 233, 234, 235.)

Allegations regarding the defendants' "outrageous" conduct, as detailed in paragraphs 200 through 232, are substantially identical to the allegations of negligent conduct set forth in paragraphs 60 through 92 of the third amended complaint. Paragraphs 200 through 232 thus will be stricken as redundant.[26]

The defendants argue that the defendants' alleged misconduct is not bad enough to support a claim for intentional infliction of emotional distress. Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. Heitzman v. Thompson, 705 N.W.2d 426, 431 (Neb. 2005). While not all of the defendants' alleged acts and omissions may be deemed extreme and outrageous, intentionally poisoning the plaintiffs' water supply, for example, would seem to qualify. See, e.g., Potter v. Firestone Tire & Rubber Co., 863 P.2d 795, 818 (Cal. 1993) (defendant manufacturer could be held liable for intentional infliction of emotional distress engendered by fear of cancer, without proof that cancer was more likely than not to develop, where hazardous waste disposal policies and state anti-pollution laws were ignored for the sake of reducing manufacturing costs; however, defendant was required to know that these particular plaintiffs were consuming contaminated groundwater).

---

[26] Paragraphs 60, 61, and 63 through 90 are deemed to be incorporated by reference into the "intentional infliction of emotional distress" count.

### *e. Fraud*

Paragraphs 247 though 275 of the plaintiffs' "fraud" count are substantially the same as paragraphs 62 through 90, and will be stricken as redundant.[27]

The operative allegations of fraud appear in paragraphs 276, 277, and 278 of the third amended complaint, and have been set out in full previously in this opinion. Essentially, however, it is alleged (1) that between April 30, 1990, and May 3, 1990, a plant engineer for Ford New Holland, Inc., falsely represented to the Environmental Protection Agency (EPA) that the "duck pond" at the facility had been used to collect only non-contact cooling water and storm water run-off prior to discharge to an adjacent field, and (2) that in September 2003, two officials of CNH America LLC falsely stated to a newspaper reporter that test results showed no contaminants had left the Case New Holland property.

To recover on a fraudulent misrepresentation claim, one must show (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that it should be relied upon; (5) that the party reasonably did so rely; and (6) that he or she suffered damage as a result.  Eicher v. Mid America Financial Inv. Corp., 702 N.W.2d 792, 803 (Neb. 2005).  Each of these elements has been alleged by the plaintiffs, albeit in cursory fashion, with respect to elements two through six.

The defendants argue that intent to defraud and detrimental reliance have not been adequately alleged under Federal Rule of Civil Procedure 9(b) because no facts are stated regarding how or when the plaintiffs learned of the false statements that allegedly were made to the EPA and to the newspaper reporter, and because no facts are stated regarding the alleged detrimental reliance by each plaintiff (and minor).

---

[27] Paragraphs 63 through 90 are deemed to be incorporated by reference into the "fraud" count.

The plaintiffs merely claim that they "based their actions on their reliance of these false material misrepresentations . . . [and] were deprived of the right to make informed decisions regarding their exposure to Contaminants[.]" (Filing 94, ¶ 278.)

The Eighth Circuit has indicated that all elements of a state-law fraudulent misrepresentation claim must be stated with particularity in order to comply with Rule 9(b). See Allison v. Security Ben. Life Ins. Co., 980 F.2d 1213, 1215-16 (8th Cir. 1992). More recently, however, it has stated that Rule 9(b) must be interpreted "in harmony with the principles of notice pleading." Abels, 259 F.3d at 920.

In this case, I agree with the defendants that essential information regarding their alleged fraudulent intent and the plaintiff's alleged detrimental reliance has not been pleaded. Although the plaintiffs have included a pro forma allegation that the defendants "intended [the plaintiffs] to rely on these false material representations" (Filing 94, ¶ 278), there is nothing in the third amended complaint to support this allegation. Indeed, one can only assume that the alleged misrepresentation in 1990 was intended to mislead the EPA, not the plaintiffs. The defendants can have no liability to the plaintiffs for a misrepresentation that was made to a third party unless they "intend[ed] or ha[d] reason to expect that its terms [would] be repeated or its substance communicated to [the plaintiffs]." Restatement (Second) of Torts § 533 (1977).[28] The defendants perhaps could have expected that the statements allegedly made to a newspaper reporter in September 2003 would be published and thereby made known to the plaintiffs, but the third amended complaint provides no clue as to

---

[28] "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." Restatement (Second) of Torts § 533 (1977). But cf. Abrahamson v. First Nat. Bank of Holdrege, No. 4:05CV3039, 2006 WL 277109, *8 (D. Neb. Feb. 3, 2006) (discussing limited liability for negligent misrepresentations made to third parties under Restatement (Second) of Torts § 552).

what "actions" the plaintiffs allegedly took in reliance upon such statements if they were in fact published, or why they were harmed as a result. The "circumstances constituting fraud" under Rule 9(b) include "what was obtained [by the defendants] or given up [by the plaintiffs]" because of the false statement. Schaller Telephone Co., 298 F.3d at 746. Nor does the allegation that the plaintiffs were "deprived of the right to make informed decisions" show that there was any detrimental reliance upon the statements—to the contrary, it appears that the plaintiffs are complaining that information was not disclosed, which is a different matter entirely.

For the reasons discussed above, the "fraud" count will be dismissed for failure to state a claim upon which relief can be granted, and I will strike paragraphs 244 through 247 and 276 through 287 of the third amended complaint. Because the facts alleged in paragraphs 248 through 275 of the "fraud" count may be material to the defendants' statute of limitations defense, they will not be stricken.

It is also apparent that Unisys Corporation has no liability in any event for fraudulent misrepresentations that allegedly occurred after it sold the property in 1986. Thus, even if the "fraud" count were not being dismissed in its entirety, I would dismiss the count as against Unisys and strike paragraph 287 of the third amended complaint, wherein the plaintiffs allege that Unisys is liable for fraud, both directly and as successor-in-interest to Sperry Corporation.

While I have granted the plaintiffs leave to file a fourth amended complaint to allege alter ego liability on the part of Ford Motor Company, I have not granted them leave to amend for any other purpose. Thus, the plaintiffs shall not include a "fraud" count in their fourth amended complaint, if one is filed.

### f. Fraudulent Concealment

The plaintiffs also allege that the defendants "concealed or suppressed material facts that they had a duty to disclose to certain government agencies for the benefit

of the public." (Filing 94, ¶ 321.) In particular, the defendants are alleged to have (1) intentionally failed to notify the EPA, as required by CERCLA, 42 U.S.C. § 9603(c), that hazardous wastes were stored, treated, or disposed of in unlined ponds or pits;[29] (2) intentionally failed to notify the plaintiffs or government agencies of a 1992 report indicating that contaminants may have migrated offsite; (3) intentionally failed to notify the National Response Center of a release of xylene in 1999 that was a reportable quantity under 40 C.F.R. § 302.4; and (4) intentionally failed to notify the State Emergency Response Commission or the Local Emergency Planning Committee of the 1999 xylene release. (Id.) Additional allegations relating to this "fraudulent concealment claim (paragraphs 322 through 327) have been set out earlier in this opinion. Paragraphs 291 though 319 are repetitious of paragraphs 62 through 90 and will be stricken as redundant.[30]

The elements that must be alleged and proven to establish fraudulent concealment are (1) that the opposing party had a duty to disclose a material fact; (2) that the opposing party, with knowledge of the material fact, concealed the fact; (3) that the material fact was not within the alleging party's reasonably diligent attention, observation, and judgment; (4) that the opposing party concealed the fact with the intention that the alleging party act in response to the concealment or suppression; (5) that the alleging party, reasonably relying on the fact or facts as he or she believed them to be as the result of the concealment, acted or withheld action; and (6) that the alleging party was damaged by the opposing party's action or inaction in response to the concealment. Precision Enterprises, Inc. v. Duffack Enterprises, Inc., 710 N.W.2d

---

[29] CERCLA §103(c), codified as 42 U.S.C.§9603(c), required owners and former owners of a facility where hazardous wastes had been stored, treated, or disposed of to notify the EPA of the existence of such facility within 180 days after December 11, 1980. In this case, the only defendant that might have been subject to this one-time reporting requirement is Unisys Corporation.

[30] Paragraphs 63 through 90 are deemed to be incorporated by reference into the "fraudulent concealment" count.

348, 355 (Neb. App. 2006).  Existence of a duty to disclose is a question of law. Streeks, Inc. v. Diamond Hill Farms, Inc., 605 N.W.2d 110, 121 (Neb. 2000).

Filing a false report with a government agency may give rise to a claim for fraudulent misrepresentation under certain circumstances, see Restatement (Second) of Torts § 536 (1977) ("If a statute requires information to be furnished, filed, recorded or published for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability . . . ."), but the plaintiffs have cited no authority for the proposition that the failure to file a report with a government agency can provide the basis for a private right of action for fraudulent concealment.  Thus far, the Nebraska Supreme has only recognized that a duty to disclose may arise among parties to a business transaction.  See Streeks, 605 N.W.2d at 119-20 (applying Restatement (Second) of Torts § 551).  I have no reason to think that the Nebraska Supreme Court would permit the plaintiffs to recover on a fraudulent concealment theory based on the factual circumstances alleged in this case.[31]  Consequently, the "fraudulent concealment" count will be dismissed, and paragraphs 288 through 290 and 328 through 336 of the third amended complaint will be stricken in addition to the redundant paragraphs, 291 though 319.  Paragraphs 320 through 327 may be material to the statute of limitations defense and will not be stricken.

Again, if the plaintiffs opt to file a fourth amended complaint, they shall not include a "fraudulent concealment" count in such pleading.

### g. Battery

Battery is an intentional tort which includes physical contact with another without consent or justification.  Kant, 704 N.W.2d at 540.  A battery requires "an

---

[31] The defendants have also convincingly demonstrated that the plaintiffs cannot maintain a citizen suit under CERCLA.  The plaintiffs do not dispute this legal conclusion, nor do they purport to be bringing any type of statutory action.

actual infliction" of an unconsented injury upon or unconsented contact with another. Bergman by Harre v. Anderson, 411 N.W.2d 336, 339 (Neb. 1987) (quoting Newman v. Christensen, 31 N.W.2d 417, 418 (1948)).  A hostile motive is not an element.  See Westcott v. City of Omaha, 901 F.2d 1486, 1489 (8th Cir. 1990) (citing Bergman).

The plaintiffs allege that, without their consent, the defendants intentionally: (1) "discharged Contaminants into [the plaintiffs'] water, soil, and air with the intent that [the plaintiff's] would come into contact with the contaminated water, soil, and air[;]" (2) "discharged Contaminants into an unlined pond and unlined pits with the intent that such Contaminants would migrate offsite into [the plaintiffs'] water, soil, and air supply and with the intent that [the plaintiffs] would come into contact with the contaminated water, soil, and air[;]" (3) "withheld information from [the plaintiffs about [the defendants' intentional discharge of Contaminants into [the plaintiffs'] water, soil, and air[;]" (4) "withheld information from [the plaintiffs] about [the defendants'] intentional discharge of Contaminants into an unlined pond and unlined pits on the Property, despite knowledge that these contaminants would migrate into [the plaintiffs'] water, soil, and air[;]" and (5) "chose not to remediate contamination they knew existed on the Property, despite knowledge that these Contaminants were migrating from the Property and into [the plaintiffs'] water, soil, and air."  (Filing 94, ¶¶ 339-43.)

Insofar as the plaintiffs have alleged that the defendants intended for them to come into contact with hazardous waste from the Sperry New Holland property, I find that they have stated a claim upon which relief can be granted.  See, e.g., Werlein v. United States, 746 F. Supp. 887, 907 (D.Minn. 1990) (defendant could be liable for battery under Minnesota law if it disposed of toxic material with the intent to cause an offensive or harmful contact with plaintiffs, or knew that such contact was substantially certain to occur), vacated in part on other grounds, 793 F. Supp. 898 (D.Minn. 1992).  The plaintiffs' additional allegations regarding the withholding of information and the failure to remediate known contamination appear misplaced.

### *h. Trespass to Real Property*

Using language somewhat similar to that contained in the "battery" count, the plaintiffs allege that, without their consent, the defendants:  (1) "discharged contaminated water from the facility and allowed it to enter [the plaintiffs'] property[;]" (2) "discharged Contaminants into an unlined pond and unlined pits with the intent that such Contaminants would migrate offsite into [the plaintiffs'] water, soil, and air supply and with the intent that [the plaintiffs] would come into contact with the contaminated water, soil, and air[;]" (3) intentionally chose not to remediate Contaminants, knowing that these Contaminants were migrating off the Property and into [the plaintiffs'] water, soil, and air supply on [the plaintiffs'] properties[;]" and (4) "intentionally chose not to tell [the plaintiffs] about the migration of Contaminants from the Property into [the plaintiffs'] water, soil, and air supply on [the plaintiffs'] properties."  (Filing 94, ¶¶ 357 through 360.)  It is also alleged that, as a result, "the value of [the plaintiffs'] properties is diminished."  (Id., ¶ 362.)

"[L]iability for trespass exists if an actor intentionally 'enters land in the possession of [another], or <u>causes a thing</u> or a third person to do so.'"  <u>Lambert v. Holmberg</u>, 217 Neb. 443, ___ N.W.2d ___, 2006 WL 1044215, *4 (Neb. Apr. 21, 2006) (quoting <u>Restatement (Second) of Torts</u> § 158(a) at 277 (1965)) (emphasis in original).  Thus, an "actor, without himself entering the land, may invade another's interest in its exclusive possession by throwing, propelling, or placing a thing either on or beneath the surface of the land."  <u>Id.</u> (quoting <u>Restatement</u> § 158, comment i).  Further, "it is not necessary that the foreign matter should be thrown directly and immediately upon the other's land.  It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter."  <u>Id.</u>

Insofar as the plaintiffs allege that their properties have been contaminated by discharges from the defendants' plant, an actionable claim for trespass is stated.  To bring an action for trespass, however, the complaining party must have had title to or

legal possession of the land when the acts complained of were committed.[32]  Id.
(citing Dugan v. Jensen, 510 N.W.2d 313 (1994).)   Although the defendants
understandably desire more information concerning the plaintiffs' alleged property
interests, I will not require further amendment of the pleadings (nor will I dismiss the
plaintiffs' action for lack of information, as urged by the defendants).  The plaintiffs
who claim to own property surrounding the Case New Holland property are identified
in paragraph 4 of the third amended complaint and are designated as "Personal Injury
and Property Owner Plaintiffs."

### i.  Private Nuisance

The Nebraska Supreme Court has adopted the law of nuisance as articulated
in the Restatement (Second) of Torts.  Bargmann v. Soll Oil Co., 574 N.W.2d 478,
486 (Neb. 1998) (citing Kopecky v. National Farms, Inc., 510 N.W.2d 41 (1994), and
Hall v. Phillips, 436 N.W.2d 139 (1989)).  Thus, in a law action one may be subject
to liability for a tortious private nuisance (1) if the defendant's conduct is a proximate
cause of an invasion of another's interest in the private use and enjoyment of land and
(2) if the invasion is intentional and unreasonable or is otherwise actionable under
rules controlling liability for negligence or liability for abnormally dangerous
conditions or activities.  Id.

Paragraphs 374 through 406 of the "private nuisance" count are substantially
the same as paragraphs 60 through 92 of the "negligence" count, and will be stricken
as redundant.[33]  The plaintiffs, who are limited in this count to "Personal Injury and
Property Owner Plaintiffs," newly allege that "[the defendants'] actions are invading

---

[32] "A trespass on land subjects the trespasser to liability for physical harm to
the possessor of the land at the time of the trespass, or to the land or to his things, or
to members of his household or to their things . . . ."  Restatement (Second) of Torts
§162 (1965).

[33] Paragraphs 60, 61, and 63 through 90 are deemed to be incorporated by
reference into  the "private nuisance" count.

[the plaintiffs'] interests in the private use and enjoyment of their land because their actions are causing Contaminants harmful to human life, plant life, and animal life to invade [the plaintiffs'] properties, . . . and [the defendants] knew or should have known that these dangerous waste materials would migrate offsite and invade [the plaintiffs'] interest in the private use and enjoyment of their land.  (Filing 94, ¶ 407.) They also allege (1) that the "discharge of dangerous waste materials and the subsequent contamination of the Case New Holland Property and the surrounding area was and is intentional and unreasonable . . . [or] otherwise actionable under the rules controlling liability for negligence . . .[;]" (2) that the "discharge of dangerous waste materials into an unlined pond, unlined burial pits, and unregulated burn pits and the resulting contamination of the Case New Holland Property and the surrounding area are abnormally dangerous activities . . .[;] and (3) that "[p]ursuant to Nebraska Statute § 81-1506,[34] these discharges are prima facie evidence that [the defendants] maintained and continue to maintain a nuisance injurious to [the plaintiffs]."  (Id., ¶¶ 408 through  411.)  These plaintiffs seek to recover damages for "lost use of property, lost rental value of property, denial of useful and quiet enjoyment of property, diminution in fair market value of property, impairment of the ability to market and sell property, losses related to contamination of property, personal inconvenience, personal discomfort, and injury to health."  (Id., ¶ 412.)

I conclude that these allegations, considered with reference to third amended complaint as a whole, are sufficient to state a claim upon which relief can be granted. The plaintiffs state that they "are not asserting a cause of action for public nuisance pursuant to Neb. Rev. Stat. § 81-1506," but have merely alleged a violation of the statute as prima facie evidence of a private nuisance.  (Filing 108, at 40.)

---

[34] Section 81-1506 is part of the Nebraska Environmental Protection Act.

### j.  Unjust Enrichment

The plaintiffs next allege (1) that "[b]y discharging Contaminants onto [the plaintiffs'] land and into [their] air, soil, and water supply rather than taking proper measures to dispose of Contaminants and failing to remediate resulting Contamination, [the defendants] derived a benefit from [the plaintiffs], of which [the defendants] had knowledge[;] (2) that "[the defendants knew of, voluntarily accepted, and retained this benefit conferred on them by [the plaintiffs] by continuing to discharge Contaminants . . . and failing to remediate those Contaminants . . .[;]" and (3) that "[c]ircumstances are such that it would be inequitable for [the defendants] to retain the benefit gained by the disposal of Contaminants and failure of remediation of resulting contamination by [the defendants] without paying the value thereof to [the plaintiffs]."  (Filing 94, ¶¶ 423, 424, 425.)  The plaintiffs claim that they are owed "an amount equal to the amount [the defendants] saved by . . . not properly disposing of Contaminants since 1965 and failing to remediate Contaminants since 1965."  (Id., ¶ 425.)

The defendants argue that "[i]n order to state a claim for unjust enrichment, the Plaintiffs must allege and establish that there was a pre-existing relationship to confer a benefit upon the Defendants by the Plaintiffs, as well as knowledge or appreciation of the benefit under circumstances making it inequitable and unconscionable for the Defendants to retain the benefit without payment for value."  (Filing 100, at 34-35.)  This does not appear to be an accurate statement of Nebraska law.  Nebraska cases frequently cite to Restatement of the Law of Restitution, which broadly provides that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other."  Restatement (First) of Restitution § 1 (1937).  More particularly, it is stated that "[a] person is not permitted to profit by his own wrong at the expense of another."  Id., § 3.  In fact, there is some direct Nebraska authority for allowing restitution in the absence of a pre-existing relationship.  See, e.g., Home Pride Foods, Inc. v. Johnson, 634 N.W.2d 774, 782-83 (Neb. 2001) (discussing damages for unjust enrichment under § 87-504 of the Nebraska Trade Secrets Act,

where defendant misappropriated plaintiff's confidential customer list and used it to solicit business).

Admittedly, the plaintiffs have not alleged a typical unjust enrichment claim. Their claim is not unprecedented, however.  For example, in Branch v. Mobil Oil Corp., 778 F.Supp. 35 (W.D.Okl. 1991), the plaintiff landowners claimed that the defendant had polluted their property, and they sought recovery on the basis of unjust enrichment and public nuisance.  In denying the defendant's motion to dismiss the unjust enrichment claim, the court stated:

> Unjust enrichment can occur when a defendant uses something belonging to the Plaintiff in such a way as to effectuate some kind of savings which results in or amounts to a business profit.  See D. Dobbs, Handbook on the Law of Remedies § 4.5 (1973) at p. 278.  See also Tilghman v. Proctor, 125 U.S. 136, 146, 8 S.Ct. 894, 899, 31 L.Ed. 664, 667 (1888); Olwell v. Nye & Nissen Co., 26 Wash.2d 282, 173 P.2d 652 (1946).  Oklahoma recognizes a claim for negative unjust enrichment. See McBride v. Bridges, 202 Okla. 508, 215 P.2d 830, 832 (1950).  See also Booker v. Sears Roebuck & Co., 785 P.2d 297, 303 (Okla.1989) (Summers, J., dissenting).  The Court cannot say that Plaintiffs' Complaint does not state a claim for unjust enrichment on which relief can be granted based on a failure to allege a benefit conferred on Defendants. . ..  It can be inferred from Plaintiffs' Amended Complaint that Defendants used Plaintiffs' property to dispose of pollutants and saved the expenses of otherwise collecting and disposing of same.

Id., at 35 -36.  See also N.C. Corff Partnership, Ltd. v. OXY USA, Inc. 929 P.2d 288, 295 (Okl.App. 1996) (landowners could plead alternative claim for unjust enrichment alleging that defendant oil and gas well operator polluted their groundwater and was economically benefitted thereby).

### k.  Wrongful Death

Finally, wrongful death claims are asserted under Neb. Rev. Stat. § 30-809 by the personal representatives of the estates of eight decedents, as identified in

paragraph 5 of the third amended complaint. Paragraphs 60 through 92 once again are repeated, as paragraphs 437 through 469. The latter paragraphs will be stricken as redundant.[35]

It is alleged that the decedents would have been entitled "to maintain an action and recover damages against [the defendants] under each and every cause of action set forth [in the third amended complaint] if death had not ensued." (Filing 94, ¶ 472.) Thus, my rulings on the preceding 10 theories of recovery apply equally to this "wrongful death" count. As stated previously, I will not now determine whether the wrongful death claims are barred by the applicable 2-year statute of limitations.

### 7. *Damages*

The third amended complaint concludes with an "a-to-z" listing of damages that the plaintiffs claim to have suffered. Inasmuch as each count includes a separate paragraph alleging damages, this part of the complaint (paragraph 483) is mere surplusage, and it will be stricken.

The defendants also take issue with the prayer for relief in the third amended complaint (at page 159), wherein the plaintiffs request that the defendants be adjudged jointly and severally liable.[36] Although Federal Rule of Civil Procedure 8(a)(3) requires that a pleading contain "a demand for judgment for the relief the pleader seeks," the prayer for relief is not considered part of the claim for purposes of testing the sufficiency of the pleading under Rule 8(a)(2). See 5 Wright & Miller § 1255 at 508-09. In other words, the prayer for relief is beyond the scope of the defendants' Rule 12(b)(6) motions.

---

[35] Paragraphs 60, 61, and 63 through 90 are deemed to be incorporated by reference into the "wrongful death" count.

[36] The plaintiffs also allege joint and several liability in paragraph 54 of the third amended complaint, but this is a conclusion of law that is of no consequence.

## CONCLUSION

As summarized in the first part of this opinion, Unisys Corporation and CNH America LLC are potentially liable as owners of the property and as successors-in-interest to previous owners, while CNH Global N.V., Case New Holland, Inc., and Fiatallis North America LLC may have alter ego liability; however, none of these defendants can be held liable for "controlling" remediation efforts or for entering into contracts, and the allegations made against Ford Motor Company do not establish that it is liable in any capacity.  In examining each theory of recovery, I have also held that there can be no recovery for the alleged fraud or fraudulent concealment, and I have stricken redundant allegations.

Accordingly,

IT IS ORDERED that:

1.    Filing 120, Plaintiff's motion to file supplemental memoranda, is granted instanter.

2.    Filing 95, Defendant Ford Motor Company's motion to dismiss the third amended complaint, is granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  Consistent with such dismissal, and without limitation, the following paragraphs of the third amended complaint alleging liability on the part of Ford Motor Company are stricken in their entirety:  Paragraphs 49, 50, 101, 150, 196, 242, 286, 335, 352, 370, 419, 432, and 480.

3.    Filings 97, 99, and 101, motions to dismiss the third amended complaint filed by Defendants Unisys Corporation, CNH America LLC, Fiatallis North America LLC, Case New Holland, Inc., and CNH Global N.V., are granted in part and denied in part, as follows:

a.   Pursuant to Federal Rule of Civil Procedure 12(b)(6), all claims that Defendants are liable because of their control of remediation efforts or because of contractual liability are dismissed with prejudice. Consistent with such dismissal, and without limitation:

   i.   Paragraphs 51, 62, 91, 92, 107, 136, 137, 156, 185, 186, 202, 231, 232, 247, 291, 376, 405, 406, 439, 468, and 469 of the third amended complaint are stricken in their entirety.

   ii.   All references to "Control Defendants" are hereby stricken from the following paragraphs of the third amended complaint:  Paragraphs 93, 94, 138, 139, 140, 141, 142, 143, 187, 188, 189, 233, 234, 235, 246, 276, 277, 278, 279, 290, 320, 321, 322, 323, 328, 341, 342, 343, 344, 345, 359, 360, 407, 408, 409, 410, 411, 412, 423, 424, 425, 470, 471, 472, and 473.

   iii.   All allegations that Unisys Corporation is directly liable through "its control of the facility, and through its contractual agreement to accept liability for certain contaminated areas at the facility," are stricken from the following paragraphs of the third amended complaint: Paragraphs 102, 151, 197, 243, 287, 336, 353, 371, 420, 433, and 481.

b.   Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff's "fraud" count is dismissed and paragraphs 244 through 247 and 276 through 287 of the third amended complaint are stricken.

       c.      Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff's "fraudulent concealment" count is dismissed and paragraphs 288 through 290 and 328 through 336 of the third amended complaint are stricken.

       d.      In all other respects, Defendants' motions to dismiss are denied.

4.     Defendant Unisys Corporations's request for oral argument (filing 97) is denied.

5.     On the court's own initiative, pursuant to Federal Rule of Civil Procedure 12(f), the following paragraphs of the third amended complaint are stricken in their entirety, as redundant:  Paragraphs 105 through 137, 154 through 186, 200 through 232, 247 through 275, 291 through 319, 374 through 406, 437 through 469, and 483.

6.     Within fourteen (14) days of today's date, the plaintiffs may file a fourth amended complaint to allege that Ford Motor Company disregarded corporate formalities and controlled day-to-day operations at the facility when it was owned by its subsidiary, Ford New Holland, Inc., or to allege that Ford Motor Company has alter ego liability for some other fact-based reason.  If a fourth amended complaint is filed, the plaintiffs shall not re-allege any paragraphs or portions of paragraphs that have been ordered stricken, except possibly paragraph 50 and those portions of paragraphs 101, 150, 196, 242, 352, 370, 419, 432, and 480 that claim Ford Motor Company has alter ego liability.

7.     If the plaintiffs do not file a fourth amended complaint as provided in the preceding paragraph, a final judgment shall be entered pursuant to Federal Rule of Civil Procedure 54(b) that dismisses Ford Motor Company as a party defendant, there being no just reason for delay.

-66-

8.    If the plaintiffs do not file a fourth amended complaint within the time allowed by this order, all remaining Defendants, except Fiat S.p.A., shall file an answer to the third amended complaint on or before June 13, 2006; Fiat S.p.A. may answer or otherwise plead to the third amended complaint by such date.  If the plaintiffs do file a fourth amended complaint within the time allowed by this order, all Defendants will have the usual rule time to respond to such pleading.

May 4, 2006.                           BY THE COURT:

                                       s/ *Richard G. Kopf*
                                       United States District Judge