IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CINDY AVILA, et al., | ) | Case No. 4:04CV3384 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CNH AMERICA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| JOAN SCHWAN, et al., | ) | Case No. 4:07CV3170 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CARGILL, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

These related "toxic tort" cases are before the court on motions for summary judgment filed by Cargill, Incorporated ("Cargill").  (Case No. 4:04CV3384, filing 329; Case No. 4:07CV3170, filing 59.)  Because there is no evidence that Cargill caused or permitted the release of chlorinated solvents on property that it owned between 1981 and 2000, or that Cargill knew or should have known of subsurface contamination that was caused by the previous owner's manufacturing operations between 1973 and 1980, the motions will be granted.  The plaintiffs' requests for additional time to conduct discovery under Federal Rule of Civil Procedure 56(f), in the hope of finding some evidence of Cargill's culpability, will be denied.

# I. BACKGROUND

Case No. 4:04CV3384 ("*Avila*") was commenced on December 16, 2004, but Cargill was not named as a defendant in the action until June 15, 2007, when a fourth amended complaint was filed. The other seven defendants[1] in *Avila* are owners and former owners of an industrial tract located at 3445 West Stolley Park Road, Grand Island, Nebraska (the "CNH Plant"), that is alleged to be a source of groundwater contamination (designated as the "northern plume") affecting the nearby residential subdivisions of Stolley Park and Parkview (collectively, the "Parkview Community"). Cargill is a former owner of a commercial property located at 3304 Engleman Road South, Grand Island, Nebraska (the "Engleman Road Facility"), that is also alleged to be a source of groundwater contamination (designated as the "southern plume") affecting the Parkview Community. The plaintiffs in *Avila* at the present time are 65 residents and former residents of the Parkview Community, next friends of 17 minors who reside or resided in the Parkview Community, and personal representatives of the estates of 9 deceased Parkview Community residents, who assert claims under Nebraska common law for personal injury, wrongful death, and property damage.[2]

The southern plume also crosses the Grand Island subdivisions of Mary Lane, Castle Estates, and Kentish Hills (collectively, the "Mary Lane Community") before commingling with the northern plume under the Parkview Community. The *Avila* case originally included numerous plaintiffs from the Mary Lane Community, but they were dismissed from the action on April 11, 2007, when the court granted a

---

[1] The other *Avila* defendants are (1) CNH America LLC, (2) Fiatallis North America, Inc., (3) Case New Holland, Inc., (4) CNH Global, N.V., (5) Unisys Corporation, (6) Fiat S.p.A., and (7) Fiatallis North America, LLC. Two additional defendants named in the original complaint, New Holland, Inc., and Ford Motor Company, have been dismissed from the action.

[2] Eighteen of these 91 plaintiffs in *Avila* assert claims only against the CNH Plant owners. The remainder assert claims against all defendants.

motion for partial summary judgment in favor of the defendants.[3]  (*Avila* filing 204.)
The dismissed plaintiffs had failed to disclose evidence in response to a *Lone Pine*
case management order[4] and had stated through their attorney that they "no longer
contend that hazardous substances from the Case New Holland facility have caused
their injuries or damage." (*Avila* filing 185, p. 2 ¶ 5.)  The court thereafter granted
leave to the remaining plaintiffs to add Cargill as a defendant, but directed that the
dismissed plaintiffs and any other persons who were not asserting claims against the
CNH Plant owners would need to file a separate action.  (*Avila* filing 221.)

A separate action, Case No. 4:07CV3170 ("*Schwan*"), was filed on June 26,
2007.  The *Schwan* plaintiffs currently consist of 157 adult residents and former
residents of the Mary Lane Community, next friends of 39 minors, and 1 personal
representative.  Cargill is the only named defendant in *Schwan*.

Cargill used the Engleman Road Facility as a warehouse for its Seed Division.
The previous owner, Heinzman Engineering, Inc. ("Heinzman"), used the property
for a manufacturing operation until June 1980, and then as an equipment dealership
for about two years.  Cargill purchased the property in December 1981, but did not
take full possession until June 1982.  Cargill sold the property in November 2000.

In late 2001, the City of Grand Island closed a municipal groundwater well
after detecting increased concentrations of chlorinated solvents.  Shortly thereafter,

---

[3] Originally, the first-named plaintiff in *Avila* was Joan Schwan, individually
and as next friend of J.P.S., a minor.  Ms. Schwan is now the first-named plaintiff in
Case No. 4:07CV3170.

[4] On October 31, 2005, the court advised the parties that it was inclined to enter
a case management order patterned after *Lore v. Lone Pine Corp.*, No. L 33606-85,
1986 WL 637507 (N.J. Super. Ct. Law Div., Nov. 18, 1986), to "require the plaintiffs
to define their injuries with precision and to produce some evidence of causation prior
to any discovery taking place."  (*Avila* filing 93, p. 8.)  On motion of the defendants,
a *Lone Pine* order was in fact entered on May 4, 2006.  (*Avila* filing 135.)

the Nebraska Department of Environmental Quality ("NDEQ") began investigating the source and extent of contamination.  In 2003, the United States Environmental Protection Agency ("EPA") took over the investigation.  Investigators initially concentrated on the CNH Plant, but in July 2006 it was determined by the EPA that the Engleman Road Facility was also a source of the groundwater contamination.

By deposing several former Heinzman employees, Cargill has discovered that chlorinated solvents were regularly dumped on the ground before it purchased the Engleman Road Facility.  There is no evidence that Cargill previously knew of this dumping activity, nor is there any evidence that solvents or other chemicals were improperly disposed of during the 19 years that Cargill owned the property.  Cargill argues that it cannot be held liable under Nebraska law for Heinzman's dumping activities unless the pollution was "visible and apparent," which it was not.  The plaintiffs argue that Cargill had a duty to investigate the condition of the property, and also speculate that discovery they intend to conduct in the future may disclose that Cargill contributed to the pollution.

### A.  Statement of Material Facts

Upon careful review of the parties' pleadings, evidence, and briefs, I find that the following facts are undisputed:

<u>Heinzman's Operations</u>

Heinzman was first incorporated in Nebraska in 1958.  Heinzman operated at least two separate divisions: an irrigation division that manufactured irrigation pipe and sprinklers, and a John Deere division that sold and serviced industrial and construction equipment.  Both divisions were originally based at a different Grand Island location on South Locust Street.  (*Avila* filing 330, p. 7, ¶ 6; *Schwan* filing 60, p. 7, ¶ 5; *Avila* filing 340 & *Schwan* filing 71, p. 33, ¶ 6.)

4

In 1973, Heinzman built the Engleman Road Facility for its irrigation division. The facility was built on former agricultural land. After construction was complete, Heinzman moved the irrigation division and its equipment over from South Locust Street. Heinzman employed between 50 to 60 workers at its new facility. (*Avila* filing 330, p. 7, ¶ 7; *Schwan* filing 60, p. 7, ¶ 6; *Avila* filing 340 & *Schwan* filing 71, p. 33, ¶ 7.)

Heinzman's irrigation division operated two aluminum tube mills at the Engleman Road Facility. Aluminum entered the facility in large rolled coils that weighed several tons each. The aluminum was oily when it arrived. It was pulled off the coils and fed into a conveyor that bent the aluminum into a circular shape. The edges were then welded together to form the pipe. (*Avila* filing 330, pp. 7-8, ¶ 8; *Schwan* filing 60, p. 7, ¶ 7; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 8.)

Before the welding occurred, the oil and other impurities were cleaned off the edges of the aluminum to ensure that the seam was properly welded. The edges of the aluminum passed over a trough filled with cleaning solvent, such as perchloroethylene (also known as tetrachloroethylene, perc, or PCE). A rotating brush continuously dipped into the solvent and cleaned the aluminum as it passed over the trough. (*Avila* filing 330, p. 8, ¶ 9; *Schwan* filing 60, pp. 7-8, ¶ 8; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 9.)

Heinzman regularly removed used solvent from the troughs and dumped it on the ground outside the building. Heinzman used anywhere from two to twelve 55-gallon barrels of the solvent each year and dumped a small amount of used solvent on the ground every day. Heinzman's irrigation division began this disposal practice long before it moved to the Engleman Road Facility. It had engaged in similar dumping while its irrigation division used the same equipment and processes at the South Locust Street facility during the 1960's and early 1970's. Heinzman provided no other means for its employees to dispose of the used solvent. (*Avila* filing 330, p. 8, ¶ 10; *Schwan* filing 60, p. 8, ¶ 9; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 10.)

The tube mill operation continued at the Engleman Road Facility until the spring of 1980, when Heinzman closed its irrigation division as a result of difficult market conditions. On June 24, 1980, Heinzman sold its manufacturing equipment and irrigation inventory at public auction. (*Avila* filing 330, p. 8, ¶ 12; *Schwan* filing 60, p. 8, ¶ 11; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 12.)

Around the same time, on June 3, 1980, a tornado destroyed Heinzman's South Locust Street facility, where its John Deere division had continued to operate during the 1970's. As a result, the dealership and service center moved to the Engleman Road Facility. (*Avila* filing 330, p. 9, ¶ 13; *Schwan* filing 60, p. 8, ¶ 12; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 13.)

There is no evidence that Heinzman's John Deere division disposed of solvents or any other chemicals onsite. One former employee testified that, to his knowledge, during the time Heinzman operated its John Deere division at the Engleman Road facility a different type of solvent was used for parts washing, that the used solvent was picked up by a recycler, and that there was no dumping or disposal onto the ground of any chemicals by Heinzman. (*Avila* filing 330, p. 9, ¶ 14; *Schwan* filing 60, p. 9, ¶ 13; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 14; *Avila* filing 331-11 & *Schwan* filing 61-11, pp. 4-5 (Ivan Real deposition at 28:1-15, 54:8-15).)

Also in 1980, while Heinzman continued to operate the facility, Congress passed new release reporting rules in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Section 103(c) required that by June 9, 1981:

> any person who owns or operates or who at the time of disposal owned or operated . . . a facility at which hazardous substances . . . are or have been stored, treated, or disposed of shall . . . notify the [EPA] of the existence of such facility, specifying the amount and type of any hazardous substance to be found there, and any known, suspected, or likely releases of such substances from such facility.

42 U.S.C. § 9603(c).  This one-time reporting requirement was intended "to assist EPA in developing an inventory of hazardous waste sites and to help facilitate the development of priorities for attention and possible response action[s]." 46 Fed. Reg. 22144, 22144 (Apr. 15, 1981).  There is no record of Heinzman notifying the EPA or any other government agency of its past disposal practices at the Engleman Road Facility.  (*Avila* filing 330, p. 9, ¶ 15; *Schwan* filing 60, p. 9, ¶ 14; *Avila* filing 340 & *Schwan* filing 71, p. 34, ¶ 15.)

<u>Cargill's Prior Operations and Purchase of the Facility</u>

Cargill's Seed Division previously operated a distribution warehouse at a different Grand Island location on Shady Bend Road.  In 1978, NDEQ approached Cargill alleging that a discharge of wastewater containing Captan had impacted a nearby lake.  Captan is a fungicide that Cargill applied to seeds to prevent decay.  (*Avila* filing 330, pp. 9-10, ¶ 16; *Schwan* filing 60, p. 9, ¶ 15; *Avila* filing 340 & *Schwan* filing 71, p. 35, ¶ 16.)

As a result of these allegations, in November 1978, Cargill issued a "pollution" directive within its Seed Division.  The directive stated:

> In October, at our Grand Island warehouse, it was alleged by the Nebraska Department of Environmental Control that wash water from our treatment system was discharged without a National Pollutant Discharge Eliminations System Permit.  In April, without consulting the Law Department, a statement was signed that stated we were aware that a National Pollutant Discharge Elimination Systems Permit is required if this water is to be still discharged.

> Cargill Seeds' prime concern is not to pollute either the air or the water, This means that any pollution problem must be corrected.  However, if you do have contact by any environmental group (because you and your people may have missed a source of pollution)--federal, state, or local-- notify [Cargill officials] immediately, so we can aid and advise you in getting the problem corrected.

>Criminal charges can be brought against the company and its employees for pollution--particularly once the problem is brought to our attention and we continue to pollute.

>Our first rule is . . . Don't pollute!  Check your operation . . . Is it clean? . . . What happens to your water waste and dust?

>Pollution and its enforcement is a serious business.  Fines and <u>criminal</u> charges can be issued.  Don't let it happen to us.  Cargill Seeds wants to be a good citizen, so double check your potential pollution problems.  Rule 1: DON'T POLLUTE!!

The directive was reviewed by the employee with waste handling responsibility at the Grand Island facility.  (*Avila* filing <u>330</u>, p. 10, ¶ 17; *Schwan* filing <u>60</u>, pp. 9-10, ¶ 16; *Avila* filing <u>340</u> & *Schwan* filing <u>71</u>, p. 35, ¶ 17; *Avila* filing <u>331-13</u> & *Schwan* filing <u>61-13</u> (Cargill's Ex. 12).)

By 1981, Cargill was in search of a larger building for its Grand Island distribution warehouse.  Cargill learned that the Engleman Road Facility was for sale. As the real estate broker explained to Cargill, "[i]t is unusual to find this type of existing building available in our Central Nebraska area . . . in the condition this building is in."  (*Avila* filing <u>330</u>, p. 10, ¶ 18; *Schwan* filing <u>60</u>, p. 10, ¶ 17; *Avila* filing <u>340</u> & *Schwan* filing <u>71</u>, p. 35, ¶ 18; *Avila* filing <u>331-15</u> & *Schwan* filing <u>61-15</u> (Cargill's Ex. 14).)

On June 9, 1981, the same day that Heinzman failed to meet the deadline for notifying the EPA of its past disposal practices, Cargill inspected the Engleman Road Facility.  Inside the building, the inspectors noted a need to "[c]lean grease and oil off of [the] concrete floor."  Outside, the inspectors recommended "[c]lean[ing] up the grounds – remove trash, cut grass and weeds and probably clean up drainage ways so as to insure that we do not get water coming in at floor level."  There is no evidence that Heinzman disclosed its past disposal practices to Cargill.  (*Avila* filing <u>330</u>, p. 10,

¶ 19; *Schwan* filing 60, p. 10, ¶ 18; *Avila* filing 340 & *Schwan* filing 71, pp. 35-36,
¶ 19; *Avila* filing 331-16 & *Schwan* filing 61-16 (Cargill's Ex. 15), p. 3.)

On September 21, 1981, Cargill executed an agreement to buy the property for
$420,000. The agreement provided that Heinzman could continue to occupy the
facility, except for the north 100 feet of the warehouse structure, under a rent-free
lease until May 31, 1982. The only potential environmental condition disclosed to
Cargill in the agreement was the existence of underground gasoline storage tanks,
which Heinzman retained the right to take with when it left. Cargill closed on the
purchase of the property on December 15, 1981. (*Avila* filing 330, p. 11, ¶ 20;
*Schwan* filing 60, pp. 10-11, ¶ 19; *Avila* filing 340 & *Schwan* filing 71, p. 36, ¶ 20;
*Avila* filing 331-17 & *Schwan* filing 61-17 (Cargill's Ex. 16).)

<u>Cargill's Engleman Road Operations</u>

Cargill took full possession of the Engleman Road Facility in June 1982. As
Cargill's inspection team recommended, Cargill cleaned up the grounds and cut the
grass around the building. During that process, Cargill discovered a 4 x 6 foot area
away from the building that was covered with about an inch of dried red paint. After
notifying the City, Doug Taylor, Cargill's maintenance manager, scraped up the
paint-stained soil with a loader that Cargill had previously rented from Heinzman and
sent it to a landfill. (*Avila* filing 330, p. 11, ¶ 21; *Schwan* filing 60, p. 11, ¶ 20; *Avila*
filing 340 & *Schwan* filing 71, p. 36, ¶ 21; *Avila* filing 339-4 & *Schwan* filing 70-7,
p. 6 (Douglas Taylor deposition at 21:2-23:3) (Plaintiffs' Ex. C).)

Cargill's post-sale inspections did not uncover any further areas of concern.
According to Mr. Taylor, the area with red paint "was the only area where there
wasn't grass and that growing, and that's what got our attention. . . . . You know,
there was grass growing everywhere [else]."   In later years, Cargill employees
maintained a vegetable garden outside the building. (*Avila* filing 330, p. 11, ¶ 22;
*Schwan* filing 60, p. 11, ¶ 21; *Avila* filing 340 & *Schwan* filing 71, p. 36, ¶ 22; *Avila*

filing [331-12](#) & *Schwan* filing [61-12](#), p. 6 (Douglas Taylor deposition at 26:14-27:2) (Cargill's Ex. 11).)

Cargill's operations at the facility included: (a) receiving and storing bags of seed; (b) shipping bags of seed; and (c) during the first few years at the facility, conditioning some of the seed by coating it with a fungicide. These operations required four to five full-time employees. (*Avila* filing [330](#), pp. 11-12, ¶ 23; *Schwan* filing [60](#), p. 11, ¶ 22; *Avila* filing [340](#) & *Schwan* filing [71](#), p. 36, ¶ 23.)

Cargill used solvent for occasional parts washing during forklift maintenance. Doug Taylor testified that "probably less than a few gallons of solvent [were] ever used . . . in that facility." There is no evidence that Cargill ever disposed of solvent outside on the ground. Cargill disposed of spent solvent by placing it in a 55-gallon drum that stored used oil. The drums of used oil were shipped offsite. (*Avila* filing [330](#), p. 12, ¶ 25; *Schwan* filing [60](#), p. 12, ¶ 24; *Avila* filing [340](#) & *Schwan* filing [71](#), p. 37, ¶ 25.)

<u>Cargill's Inspections</u>

In May 1998, Cargill commissioned an outside consultant, Conestoga-Rovers & Associates ("CRA"), to perform Environmental Assessments of all of its Seed Division facilities. The express purpose of the assessments was to identify any "recognized environmental conditions, as defined in ASTM Standard E1527-97, associated with prior or current activities conducted at the Site." As part of the assessments, CRA inspected the sites, searched regulatory databases, and interviewed individuals associated with the Seed Division facilities. (*Avila* filing [330](#), pp. 12-13, ¶¶ 27-29; *Schwan* filing [60](#), p. 12, ¶¶ 26-28; *Avila* filing [340](#) & *Schwan* filing [71](#), p. 38, ¶¶ 27-29; *Avila* filing [331-23](#) & *Schwan* filing [61-23](#), p. 4 (Cargill's Ex. 22).)

At the Engleman Road Facility, CRA found "[n]o evidence of any significant spillage at the Site . . . with the exception of minor staining on concrete floors in the

10

shop area, which would not be expected to have impacted underlying soils." The only "recognized environmental condition" identified by CRA was the lack of closure documentation on a gasoline underground storage tank that Heinzman removed before it left. CRA did not recommend any further investigation. (*Avila* filing 330, p. 13, ¶ 30; *Schwan* filing 60, p. 13, ¶ 29; *Avila* filing 340 & *Schwan* filing 71, p. 38, ¶ 30; *Avila* filing 331-23 & *Schwan* filing 61-23, p. 17 (Cargill's Ex. 22).)

In May 2000, Cargill again commissioned CRA to perform Environmental Assessments of its Seed Division facilities. At the Engleman Road Facility, CRA again found "[n]o evidence of potentially significant spills or releases." And, again, the only issue of potential concern to CRA was the lack of closure documentation on the gasoline underground storage tank. In both assessments, CRA noted that "chemicals stored and used on Site were limited to small quantities or herbicides, insecticides, gasoline, motor oil, and propane gas." CRA did not see any need for further investigation at the Engleman Road Facility. (*Avila* filing 330, pp. 13-14, ¶¶ 31-32; *Schwan* filing 60, p. 13, ¶¶ 30-31; *Avila* filing 340 & *Schwan* filing 71, pp. 38-39, ¶¶ 31-32; *Avila* filing 331-23 & *Schwan* filing 61-23, pp. 16, 19 (Cargill's Ex. 22); *Avila* filing 331-25 & *Schwan* filing 61-25, p. 15 (Cargill's Ex. 24).)

## Cargill's Sale of Seed Division

On September 13, 2000, Cargill executed a Purchase and Sale Agreement to sell its Seed Division, including the Engleman Road Facility, to Agrigentics, Inc. ("Agrigentics"). The agreement did not discuss or otherwise identify environmental conditions at the Engleman Road Facility. Instead, after referring to CRA's 1998 and 2000 environmental assessments, the agreement stated that "to the Knowledge of [Cargill], there are no Hazardous Materials present in, on, or beneath the Real Property which could be reasonably expected to result in a Cleanup." On November 1, 2000, Cargill transferred title to the Engleman Road Facility to Agrigentics. (*Avila* filing 330, p. 14, ¶¶ 33-35; *Schwan* filing 60, pp. 13-14, ¶¶ 32-34; *Avila* filing 340 &

11

*Schwan* filing <u>71</u>, p. 39, ¶¶ 33-35; *Avila* filing <u>331-26</u> & *Schwan* filing <u>61-26</u>, p. 4, § 4.14 (Cargill's Ex. 25).)

In 2001, Agrigentics (also known as Mycogen Seeds) commissioned its own outside consultant, URS, to conduct another Environmental Site Assessment of the facility. The Agrigentics/URS assessment also "revealed no evidence of recognized environmental conditions in connection with the site." (*Avila* filing <u>330</u>, p. 14, ¶ 36; *Schwan* filing <u>60</u>, p. 14, ¶ 35; *Avila* filing <u>340</u> & *Schwan* filing <u>71</u>, pp. 39-40, ¶ 36; *Avila* filing <u>331-28</u> & *Schwan* filing <u>61-28</u>, p. 27 (Cargill's Ex. 27).)

### Discovery of Solvent Contamination

In July 2006, the EPA, through its contractor, Tetra Tech, issued its Final Remedial Investigation Report for the Southern Plume Study Area. The report was the result of a phased investigation that involved several years of sampling. The report concluded—as the plaintiffs note, "for the first time"—that a chlorinated solvent "plume originates on the 3304 Engleman Road S. property." (*Avila* filing <u>330</u>, p. 14, ¶ 37; *Schwan* filing <u>60</u>, p. 14, ¶ 36; *Avila* filing <u>340</u> & *Schwan* filing <u>71</u>, p. 40, ¶ 37; *Avila* filing <u>331-29</u> & *Schwan* filing <u>61-29</u>, p. 2 (Cargill's Ex. 28).)

In September 2007, the EPA conducted a removal action "to excavate the most highly contaminated soils in the source area." The focus of the removal action was one of the areas where Heinzman's former employees admitted to dumping chlorinated solvents outside the building. (*Avila* filing <u>330</u>, p. 15, ¶ 38; *Schwan* filing <u>60</u>, p. 14, ¶ 37; *Avila* filing <u>340</u> & *Schwan* filing <u>71</u>, p. 40, ¶ 38; *Avila* filing <u>331-30</u> & *Schwan* filing <u>61-30</u>, p. 2 (Cargill's Ex. 29).)

### B. Theories of Liability

The plaintiffs first allege that Cargill was negligent in (1) failing to take appropriate measures to ensure a safe method of disposal of its waste products; (2)

failing to prevent the migration of hazardous substances from the Engleman Road Facility; (3) failing to take steps necessary to remediate existing contamination at the Engleman Road Facility; (4) failing to take steps necessary to remediate hazardous substances in the plaintiffs' water, soil, and air that stemmed from the migration; (5) failing to advise the plaintiffs of the harmful effects of coming into contact with water, soil, and air affected by the migration of hazardous substances from the Engleman Road Facility; (6) failing to provide the plaintiffs with adequate alternative sources of water; and (7) failing to report accurately to the proper government agency or agencies all environmentally relevant information in accordance with local, state, and federal rules, statutes, or regulations.  (Case No. 4:04CV3384, Fifth Amended Complaint, (*Avila* filing 282), pp. 34-35, ¶ 75; Case No. 4:07CV3170, Second Amended Complaint, (*Schwan* filing 36), pp. 18-19, ¶ 41.)

In a second count, the plaintiffs allege that Cargill was negligent in failing to warn them about the discharge and migration of the hazardous substances, and, as previously alleged, in failing to advise them of the harmful effects of coming into contact with water, soil, and air affected by the hazardous substances.  (*Avila* filing 282, p. 37, ¶ 87; *Schwan* filing 36, p. 20, ¶ 49.)  Some of the plaintiffs also claim that Cargill is liable for negligent infliction of emotional distress because of injuries that they or family members have sustained.  (*Avila* filing 282, p. 38, ¶¶ 95-97; *Schwan* filing 36, p. 21, ¶¶ 54-56.)

The plaintiffs' fourth claim for relief in each action is for private nuisance.  The plaintiffs allege in this regard that "Cargill's discharge of toxic and hazardous substances and wastes . . . is actionable under the rules controlling liability for negligence . . . [and also] under the rules controlling liability for abnormally dangerous conditions or activities."  (*Avila* filing 282, pp. 39-40, ¶¶ 104-105; *Schwan* filing 36, p. 22, ¶¶ 60-61.)  Finally, the personal representatives in each action assert wrongful death claims pursuant to Nebraska Revised Statute § 30-809.  (*Avila* filing 282, p. 44, ¶ 128; *Schwan* filing 36, p. 24, ¶ 71.)

13

## II. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

## A. Rule 56(f) Discovery

The plaintiffs argue in their briefs that Cargill's motions for summary judgment should be denied as premature, or at least continued while the plaintiffs conduct discovery. Pursuant to Federal Rule of Civil Procedure 56(f),[5] the plaintiffs have filed an affidavit by one of their attorneys which outlines the status the parties' discovery through the end of August 2008, and identifies additional discovery that the plaintiffs deem necessary regarding "what Cargill knew or should have known regarding the environmental contamination at its former property, whether Heinzman personnel disposed or otherwise released chlorinated solvents at the property during the 5-month period that Heinzman was a Cargill tenant at the facility, and whether during the following 18 years that Cargill had sole occupancy, its use of CVOCs [chlorinated volatile organic substances] as cleaning solvent or as ingredients in the pesticides that it applied or in other products that it used, contributed to the further contamination of the property." (*Avila* filing 338-3 & *Schwan* filing 70-3, p. 3, ¶ 5

---

[5] "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed.R.Civ.P. 56(f).

(Declaration of Lemuel M. Srolovic in Opposition to Cargill, Incorporated's Motions for Summary Judgment).)

Discovery does not need to be complete before a case is dismissed on summary judgment. *Pony Computer, Inc. v. Equus Computer Systems of Missouri, Inc.*, 162 F.3d 991, 996 (8th Cir. 1998).  However, summary judgment is only proper if the nonmovant has had adequate time for discovery. *Id.* (citing *Celotex*, 477 U.S. at 322). A party opposing summary judgment who believes that he has not had adequate opportunity to conduct discovery must seek relief pursuant to Federal Rule of Civil Procedure 56(f), which requires that party to show "what specific facts further discovery might unveil." *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 426 (8th Cir. 2002) (quoting *Stanback v. Best Diversified Products, Inc.*, 180 F.3d 903, 911 (8th Cir. 1999); *Dulany v. Carnahan*, 132 F.3d 1234, 1238 (8th Cir. 1997)). *See also Bradford v. DANA Corp.*, 249 F.3d 807, 809-10 (8th Cir. 2001) ("Federal Rule of Civil Procedure 56(f) does permit a party opposing a summary judgment motion to seek additional discovery, but only upon a showing of facts that the party expects to uncover."); *Roark v. City of Hazen*, 189 F.3d 758, 762 (8th Cir. 1999).  The court may then refuse to grant summary judgment, order a continuance to permit further discovery, or "such other order as is just." *Casino Magic, 293 F.3d at 911* (quoting Fed.R.Civ.P. 56(f)). "The purpose of subdivision (f) is to provide an additional safeguard against an improvident or premature grant of summary judgment . . . and [the rule] should be applied with a spirit of liberality." *Id.* (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2740 (1998)).

Rule 56(f) allows a party to request a delay in granting summary judgment if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact. *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2006).  The movant must show "good reason for being unable to present facts essential to its response." *Elnashar v. Speedway SuperAmerica, LLC,*

484 F.3d 1046, 1054 (8th Cir. 2007) (quoting *Alexander v. Pathfinder, Inc.*, 189 F.3d 735, 744 (8th Cir. 1999)).  A conclusory statement that some useful evidence could possibly be found is insufficient to preclude the termination of discovery.  *Casazza v. Kiser*, 313 F.3d 414, 421 (8th Cir. 2002); *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 606 (8th Cir.1999).  To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful.  *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008).

In *Avila*, a case progression order was entered, and discovery was thereby authorized to commence, on January 24, 2008.  (*Avila* filing 269.)  Two weeks later, on February 7, 2008, a similar order was entered in *Schwan*.  (*Schwan* filing 30.)  The court's order in each case generally adopted the parties' planning conference report, prepared pursuant to Federal Rule of Civil Procedure 26(f), in which the parties "agreed to conduct discovery in phases, focusing first on the facts necessary to determine whether third-party defendants should be added to this case and on the facts necessary to determine the extent, if any, to which any substances disposed of at the property associated with the defendant (i.e., 3304 Engleman Road) impacted plaintiffs' groundwater."  (*Schwan* filing 25, p. 6, ¶ 10a; *Avila* filing 266, p. 8, ¶ 10b.[6])  The parties stipulated that the first phase of discovery would "include, but not be limited to, the following discovery: (i) groundwater and soil sampling in multiple locations; (ii) all fact discovery from current and former defendants [sic] to this case related to the operation of the facility at 3304 Engleman Road, including the handling and disposal of all substances at issue in this case; (iii) all other fact discovery, including any soil or groundwater sampling (except for any continuing monitoring of existing wells), related to the origin, contents, scope, and duration of the

---

[6] Because of the additional defendants in *Avila* (i.e., the owners of 3345 West Stolley Park Road), the wording of the agreement in that case is slightly different.

substances which allegedly have emanated from 3304 Engleman Road and allegedly have impacted any plaintiff or plaintiff's property; and (iv) third-party fact discovery from the City of Grand Island for all purposes and from Heinzman and its former employees." (*Id.*)  As proposed by the parties, the court ordered that such "phase 1" discovery be completed by March 31, 2009, and also established the following interim deadlines:  (1) The plaintiffs were to provide Cargill with "a written request for information related to defendant's operation of, and conduct at, the facility located at 3304 Engleman Road" by February 1, 2008, in *Avila*, and by March 3, 2008, in *Schwan*.  (2) Cargill was to respond such request by April 2, 2008, in *Avila*, and by April 3, 2008, in *Schwan*.  (*Avila* filing 269, p. 3, ¶ 9a,b; *Schwan* filing 30, p. 2, ¶ 9a,b.)  Cargill's responses were actually served in each case on April 9, 2008.  (*Avila* filings 280, 288; *Schwan* filings 34, 37.)  The *Avila* progression order also specified that mandatory disclosures under Federal Rule of Civil Procedure 26(a)(1) were to be served by February 29, 2008, and that the parties were to produce any documents identified in their Rule 26(a)(1) disclosures by April 2, 2008.  (*Avila* filing 269, pp. 2, 3, ¶¶ 4, 9b.)  Cargill served its Rule 26(a)(1) disclosures on February 29, 2008, and supplemented the same on April 21, 2008.  (*Avila* filings 273, 296.)

Plaintiffs' counsel states that "[a]lthough Cargill has produced documents regarding its acquisition of the Engleman Road property, I am not aware of any documents produced to date regarding any environmental investigation or assessment of the property at or about the time of its acquisition by Cargill.  I am also not aware of any documents produced to date regarding the environmental audits of the Engleman Road facility performed by Cargill in 1988-89 and in 1994, as Cargill's former maintenance supervisor, Mr. Douglas Taylor, testified." (*Avila* filing 338-3 & *Schwan* filing 70-3, p. 6, ¶ 6.)  Mr. Srolovic acknowledges that "the plaintiffs have not to date [August 29, 2008] requested any such documents from Cargill," but states that they "intend to do so."  (*Id.*)  The plaintiffs' first request for production of documents was not served on Cargill until September 9, 2008.  (*Avila* filing 341; *Schwan* filing 72.)  Cargill, after unsuccessfully moving for a protective order based

18

on the pendency of its motions for summary judgment,[7] responded to the request for production of documents on November 17, 2008.  (*Avila* filing 373; *Schwan* filing 84.) Following such response, the plaintiffs have not asked leave to supplement their showing in opposition to the motions for summary judgment.

On September 11, 2008, the plaintiffs also served Cargill with a corporate deposition notice pursuant to Federal Rule of Civil Procedure 30(b)(6). (*Avila* filing 342; *Schwan* filing 73.)  After denying Cargill's motion for a protective order on October 17, 2008, the court directed the plaintiffs to file a new notice for taking the deposition after a period of 30 days. (*Avila* filing 358; *Schwan* filing 83.)  However, the record does not reflect that the Rule 30(b)(6) deposition has ever been re-noticed by the plaintiffs.

Plaintiffs' counsel states in his affidavit that the proposed discovery directed at Cargill is expected to provide evidence that: (1) "[P]receding and during its tenure at Engleman Road[,] . . . Cargill developed a staff of environmental experts who advised management on environmental risk management." (2) "[A]t or about the time that Cargill was considering acquiring the Engleman Road facility, Cargill had recently developed an internal program to identify the hazardous waste disposal sites of which Cargill was required to notify the U. S. Environmental Protection Agency, and to file the required notices . . . under Section 103(c) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA)." (3) "Cargill's environmental risk management practices and procedures preceding and during its tenure at Engleman Road . . . were driven by enforcement and/or litigation."  (4) "[P]receding and during its tenure at Engleman Road[,] . . . Cargill

---

[7] On October 17, 2008, Magistrate Judge Piester entered an order denying Cargill's motion for protective order.  He stated: "While it is true that plaintiffs may have been dilatory in not propounding discovery requests before now, that fact does not constitute good cause for a protective order.  It is rare that the filing of a summary judgment motion would stop the discovery process."  (*Avila* filing 358 & *Schwan* filing 83, p. 1.)

utilized significant quantities of CVOCs itself and/or was knowledgeable concerning their use and disposal." (5) "The environmental audits of the Engleman Road facility performed by Cargill in 1988-89 and in 1994 . . . revealed environmental problems at the facility and/or were deficient." (6) "Records of Cargill's use at the Engleman Road facility of CVOCs or products that may have contained CVOCs" will show "[t]hat there was a substantial volume of CVOCs at the Engleman Road facility during Cargill's tenure there."[8] (7) "Records of waste disposal by Cargill from the Engleman Road facility" will show "[t]hat Cargill did not appropriately dispose of wastes that it generated at the Engleman Road facility."[9] (8) Cargill did not generate "the documentation required under Section 2.3 of its 1996 Environment, Health and Safety Corporate Procedure Manual in its divestiture of the Engleman Road facility." (9) "Cargill sought or facilitated the development of the deficient . . .1998 and 2000 Phase I environmental site assessments ("ESAs") performed by CRA."[10] (10) "The ingredients in the pesticides Cargill used at the Engleman Road facility" contain "the type of CVOCs found in site soils and groundwater, and in offsite groundwater."[11] (*Avila* filing 338-3 & *Schwan* filing 70-3, pp. 4-5.)

The first four items of "anticipated evidence" listed above apparently are intended to demonstrate that "Cargill was a large, sophisticated company with substantial resources and environmental expertise" that "knew or should have known

---

[8] Plaintiffs' counsel indicates that discovery related to this issue would also be directed at Agrigenetics and/or Industrial Services Corporation ("ISC"), the current owner of the Engleman Road facility.

[9] Plaintiffs' counsel indicates that discovery related to this issue would also be directed at Agrigenetics and/or ISC.

[10] Plaintiffs' counsel indicates that discovery related to this issue would also be directed at Conestoga-Rovers & Associates.

[11] Plaintiffs' counsel indicates that discovery related to this issue would also be directed at the Environmental Protection Agency.

based on its own businesses and experience" that "the use of the type of chlorinated solvents, also known as chlorinated volatile organic compounds ("CVOCs"), contaminating the Engleman Road property were commonly used during the 1970s in metal fabrication for purposes of degreasing and cleaning" and that "spent CVOCs and other industrial wastes were commonly disposed of in the 1970s by dumping them in or on the grounds of manufacturing facilities[.]" [12] (*Avila* filing 340 & *Schwan* filing 71, pp. 5-6 (Plaintiffs' Brief in Opposition to Cargill, Incorporated's Motions for Summary Judgment).)  The plaintiffs argue that because of "Cargill's environmental sophistication and knowledge," Cargill should have investigated the condition of the Engleman Road Facility in 1981 when it was purchased, in order to have discovered the contamination at that time, but that "there is no evidence that Cargill conducted *any* environmental investigation of the property until 1988-89." (*Id.*, p. 6 (emphasis in original).)  As will be discussed later, however, this theory of liability is inconsistent with Nebraska law.

Regarding the 1988-89 and 1994 environmental audits, the plaintiffs state that Cargill's former maintenance supervisor, Douglas Taylor, testified at his deposition "that Cargill performed two environmental audits during the period that it owned and operated the Engleman Road facility, the first in 1988 or 1989, the second in 1994[,]" and that he "believed that audit forms would have been completed in connection with the 1988-89 and 1994 audits." (*Id.*, p. 19.)  Although these audit forms were not produced by Cargill pursuant to Rule 26(a)(1), there is no reason to suppose that the audits "revealed environmental problems at the facility and/or were deficient," as plaintiffs' counsel speculates.  In fact, Mr. Taylor testified that the audit in 1988 or 1989 dealt with "[j]ust basically the procedure of documenting everything that you

---

[12] The plaintiffs also argue that Cargill knew or should have known that "[t]he improper removal of underground gasoline storage tanks, or a failure to properly inspect the tank pits for evidence of leaks, could create significant environmental problems on the property (*Avila* filing 340 & *Schwan* filing 71, p. 6), but there is no evidence that the underground gasoline storage tanks caused any problems.

did . . . [a]s far as any type of hazardous or chemical stuff that we handled at the plant," and that there was no "auditing of . . . any contamination . . . of the soil surrounding the building[.]" (*Avila* filing <u>339-4</u> & *Schwan* filing <u>70-7</u>, p. 24 (Douglas Taylor deposition at 134:4-17) (Plaintiffs' Ex. C).)   He testified that the 1994 environmental audit was "similar to the environmental audit that was conducted in the '88, '89 timeframe" and involved "just updates." (*Id.*, at 135:9-12.)  Mr. Taylor also testified that there was no sampling of groundwater in connection with either audit, but that starting in the mid-1990's Cargill annually delivered a water sample to the city health department. (*Id.*, at 134:18-135:1, 135:13-21.)

There also is no evidence to support the supposition by plaintiffs' counsel that Cargill has business records showing that "there was a substantial volume of CVOCs at the Engleman Road facility during Cargill's tenure there" or that "Cargill did not appropriately dispose of wastes that it generated at the Engleman Road facility."  The existence of such records would contradict the sworn testimony of four former Cargill employees.[13]

Douglas Taylor, the maintenance manager for the entire operational period from 1981 through 2000, states in an affidavit dated January 23, 2008, that:

> During the period that the Seed Division operated the Engleman Road Facility, we had small amounts of solvents at the building that I used for occasional parts washing.  At no time did the Seed Division operations at the facility use solvents as part of its regular seed-related operations. At no time did I or other Seed Division employees at the facility dispose of solvents on the floor or on the ground.
>
> I am not aware of anyone, after the Seed Division purchased the Engleman Road Facility, disposing of any waste or other material,

---

[13] Cargill's warehouse operations at the facility between 1981 and 2000 only required 4 or 5 full-time employees.

including solvents, by burying it or otherwise dumping it on the ground
or in the area of the Engleman Road Facility.

(*Avila* filing [331-19](#) & *Schwan* filing [61-19](#), p.2, ¶¶ 9, 10 (Cargill's Ex. 18).)  Mr.
Taylor also testified to this effect at his deposition on June 24, 2008.  (*Avila* filing
[331-12](#) & *Schwan* filing [61-12](#), p.7, (Douglas Taylor deposition at 31:22-35:4)
(Cargill's Ex. 11).)

Robert Sliva, Cargill's warehouse foreman from 1981 through 2000, similarly
states in an affidavit dated January 22, 2008, that:

> During the period that the Seed Division operated the Engleman Road
> Facility, we had small amounts of solvents at the building that Doug
> Taylor used for occasional parts washing.  At no time did the Seed
> Division operations at the facility use solvents as part of its regular
> seed-related operations.  At no time did I or other Seed Division
> employees at the facility dispose of solvents on the floor or on the
> ground.
>
> I am not aware of anyone, after the Seed Division purchased the
> Engleman Road Facility, disposing of any waste or other material,
> including solvents, by burying it or otherwise dumping it on the ground
> or in the area of the Engleman Road Facility.

(*Avila* filing [331-22](#) & *Schwan* filing [61-22](#), p. 1, ¶¶ 5, 6 (Cargill's Ex. 21).)  Mr.
Sliva was deposed on June 25, 2008.  (*Avila* filing [331-31](#) & *Schwan* filing [61-31](#)
(Cargill's Ex. 30); *Avila* filing [339-9](#) & *Schwan* filing [70-12](#) (Plaintiffs' Ex. H).)

Edward Beckler, a seasonal worker from 1982 through 2000, provides an
identical statement in an affidavit dated January 24, 2008.  (*Avila* filing [331-21](#) &
Schwan filing [61-21](#), p. 1, ¶¶ 5, 6 (Cargill's Ex. 20).)  Mr. Beckler was deposed on
June 24, 2008.  (*Avila* filing [339-13](#) & *Schwan* filing [70-16](#) (Plaintiffs' Ex. L).)

Marge Purdy, the Engleman Road Facility manager from 1981 through 1987,[14] states in an affidavit dated January 22, 2008, that:

> From the time that the Seed Division moved into the Engleman Road Facility through the time that I retired, I am aware that the facility, through Doug Taylor, kept very small amounts of solvent on hand for the purpose of occasional parts cleaning. Solvents were not used as part of our daily operations.
>
> As manager of the Engleman Road Facility, I would have been aware of any plan or practice involving the disposal of solvents or other material on the grounds or in the area of the Facility. I am not aware of any disposal or dumping of solvents or any other material on the grounds of the facility or otherwise in the area of the facility.

(*Avila* filing 331-20 & *Schwan* filing 61-20, p.2, ¶¶ 9, 10 (Cargill's Ex. 19).) Ms. Purdy confirmed these statements at her deposition on June 25, 2008. (*Avila* filing 331-32 & *Schwan* filing 61-32, p. 2 (Marge Purdy deposition at 14:6-16:11) (Cargill's Ex. 31).)

The eighth item of "anticipated evidence" involves Cargill's failure to generate "the documentation required under Section 2.3 of its 1996 Environment, Health and Safety Corporate Procedure Manual in its divestiture of the Engleman Road facility." The plaintiffs argue that "the ESAs obtained by Cargill [in 1998 and 2000] appear not to meet the requirements of Cargill's own environmental policy in effect at that time for property divestitures, which required, '[u]nless otherwise directed by the Law Department,' a written summary of the preliminary evaluation and/or audit that included, among other things, a '[r]eview of findings and conclusions including: [a]ssessment of environmental risk; [a]ssessment of impact of past and present operations or conditions of the property on employees, customers, the community or the environment; [and] [a]ssessment of compliance with governmental and internal

---

[14] Cargill states that Ms. Purdy's immediate successor, Larry Wade, who managed the facility from 1987 through 1996, is deceased.

24

requirements.' (Opp. Exh. E [*Avila* filing 339-6; *Schwan* filing 70-9], at CAR0002603, § 2.3(1)(d).)" (*Avila* filing 340 & *Schwan* filing 71, p. 32 (Plaintiffs' Brief).)  The ninth item of "anticipated evidence" is that Cargill sought or facilitated the development of the deficient ESAs.  (Apart from the ESAs' alleged failure to satisfy Cargill's own requirements, the plaintiffs contend that the ESAs failed to meet the standards established by the American Society for Testing and Materials ("ASTM").)  As with the first four items of "anticipated evidence", the eighth and ninth items  concern a duty to investigate that simply does not exist under Nebraska tort law.

The tenth item of "anticipated evidence" is that pesticides Cargill used at the Engleman Road Facility contained CVOCs. Even assuming this to be true,[15] there is no evidence of any disposal or release of the pesticides into the ground.  Cargill's former employees testified that an exterminating company, Presto-X, was hired to spray around the inside walls of the building for insects and to set rodent traps; that there was no spraying outside the building; that an aerosol system was used in a portion of the building to control moths, with the used canisters being removed by Presto-X; that about twice a year a portable fogger was also used to fumigate for moths; and that there was no dumping or other disposal of pesticides on the property. (*Avila* filing 339-3 & *Schwan* filing 70-6, p. 17 (Marge Purdy deposition at 105:7-108:18) (Plaintiffs' Ex. B); *Avila* filing 339-4 & *Schwan* filing 70-7, pp. 21-22 (Douglas Taylor deposition at 123:18-127:2) (Plaintiffs' Ex. C); *Avila* filing 339-9

_____

[15] The request for information that the plaintiffs served on Cargill pursuant to the parties' Rule 26(f) report and the court's progression order contained a question regarding the quantity of pesticides that were used at the Engleman Road Facility, and of the identity and quantity of inert ingredients contained in the pesticides.  In a response served on April 9, 2008, Cargill objected to this request as being unduly burdensome, and stated that all of its business records were transferred in the divestiture of the Seed Division in 2000.  Cargill did, however, provide a copy of a February 26, 1999 "Hazardous Chemical Register", which included insecticide and rodenticides.  (*Avila* filing 339-15 & *Schwan* filing 70-18, p. 3 (Plaintiffs' Ex. N).)

& *Schwan* filing [70-12], p. 4 (Robert Sliva deposition at 45:4-47:25) (Plaintiffs' Ex. H);  *Avila* filing [339-13] & *Schwan* filing [70-16], p. 4 (Edward Beckler deposition at 27:14-28:25) (Plaintiffs' Ex. L).)

These former employees also testified that Cargill treated seeds with a Captan fungicide for a few years after moving to the Engleman Road Facility.  The plaintiffs state that inert ingredients in the fungicide "likely" contained a solvent.  Again, however, even assuming this to be the case, there is no evidence that the fungicide was ever discharged into the ground at this location.  Captan was improperly disposed of at the Shady Bend Road facility in 1978, which caused the NDEQ to become involved and Cargill to issue a "pollution" directive within its Seed Division. According to Doug Taylor, when the equipment that was used to treat the seed with the fungicide was cleaned periodically, the rinse water would drop through a floor drain and be discharged into a ditch; this practice was stopped after a fish kill in a nearby lake was reported to the NDEQ; thereafter, the rinse water was collected in a barrel and recycled by using it to dilute the Captan for the next treatment.[16]  (*Avila* filing [331-12] & *Schwan* filing [61-12], pp. 3, 10 (Douglas Taylor deposition at 11:10-12:8, 65:2-68:17) (Cargill's Ex. 11).) There is no evidence that Cargill reverted to the old procedure after relocating to Engleman Road.

Plaintiffs' counsel also states in his affidavit that he expects to discover from former Cargill employees, who are not otherwise identified, that "Cargill personnel knew or should have known of the disposal or release of CVOCs by Heinzman personnel" and that "CVOCs were disposed or released on-site during Cargill's tenure." (*Avila* filing [338-3], p. 6; *Schwan* filing [70-3], p. 6.)  In like manner, counsel states that he anticipates discovering from unidentified former Heinzman employees that "Cargill personnel knew or should have known of the disposal or release of

---

[16] Mr. Taylor testified that 1 gallon of the Captan fungicide was mixed with 50 gallons of water for seed treatment.  (*Avila* filing [331-12] & *Schwan* filing [61-12], pp. 9, 10 (Douglas Taylor deposition at 9:22-11:1, 65:22-25) (Cargill's Ex. 11).)

CVOCs by Heinzman personnel during Heinzman's tenancy and before, and [of] other environmental risk factors from Heinzman's operations on the property.  (*Id.*)

At least 4 former Cargill employees and 3 former Heinzman employees, Ivan Real, Randy Kosmicki, and David Grimes, have already been deposed. A fourth former Heinzman employee, Esther Schase, has also provided an affidavit to Cargill. It is not known whether any other persons who worked at the Engleman Road Facility, either for Cargill or Heinzman, are available for questioning.  All of the Heinzman employees testified that solvent used in the tube mill operation was routinely dumped on the ground.  Two of the Cargill employees, Marge Purdy and Robert Sliva, testified that they saw no evidence of this dumping activity, however. (*Avila* filing 331-32 & *Schwan* filing 61-32, p. 2 (Marge Purdy deposition at 15:8-15) (Cargill's Ex. 31); *Avila* filing 331-30 & *Schwan* filing 61-31, p. 2 (Robert Sliva deposition at 9:16-20) (Cargill's Ex. 30).)

Ivan Real continued working at the facility after Heinzman's irrigation division was sold and it became a John Deere equipment dealership.  He states in his affidavit that "[f]rom the time that the irrigation division shut down in mid-1980 until I left Heinzman, I did not use or see either the solvent or coolant material we used in the tube mill process.  Nor am I aware of anyone pouring, spilling solvents, the coolant material, paint or chemicals on the ground or elsewhere at the Engleman Rd. Facility after the irrigation division ceased operating." (*Avila* filing 331-6 & *Schwan* filing 61-6, p. 3, ¶ 16 (Cargill's Ex. 5).)  Mr. Real also testified at his deposition on May 2, 2008, that he worked at the Engleman Road Facility "for the entire period of time that Hinzman [sic] operated their Deere business there[,]" and that, to his knowledge, "there was not . . . any dumping or disposal onto the ground of any chemicals by Hinzman [sic] during that period of time[.]" (*Avila* filing 331-11 & *Schwan* filing 61-11, p. 4 (Real deposition at 28:7-15).)  The portions of the deposition that have been placed in the record do not disclose whether Mr. Real was asked if he had any contact with Cargill employees while they were sharing the facility, or if he had told them about Heinzman's prior dumping activity.

It appears that the plaintiffs have had plenty of opportunity to question the former employees about Cargill's possible knowledge of Heinzman's dumping activities.  It does not appear that further questioning of former employers would provide any evidence that Cargill knew or should have known about the dumping.

Finally, plaintiffs' counsel states in his affidavit that physical inspection of a "dry well" structure at the Engleman Road facility will show that "the structure constituted an injection well subject to federal and Nebraska regulatory requirements under their Underground Injection Well Control programs."  (*Avila* filing 338-3, p. 5; *Schwan* filing 70-3, p. 5.)  The potential relevance of such a finding is explained in the plaintiffs' brief as follows:

> When Cargill took possession of the Engleman Road facility, there was an open, below-grade concrete "pit" at the northeastern end of the facility into which a truck could back for loading at grade-level. When it rained, the open pit would collect water, and although it had a dry well structure at the bottom, water would nevertheless collect in the pit.  After using the truck loading pit for a short period of time, Cargill filled in the pit with dirt.

> If this dry well had been disclosed to the regulators, it probably would be classified as a Class V injection well under the EPA Underground Injection Control ("UIC") program, as well as the comparable NDEQ program.  The main purpose of the UIC programs is to protect underground sources of potable water from contamination. Dry wells are vulnerable to spills or illicit discharges of hazardous substances.

> At a minimun [sic], Cargill should have notified NDEQ or EPA of the existence of the dry well to determine if it was subject to regulation under the State or federal UIC programs and how it was used by Heinzman.  If this had occurred, the regulatory agencies would probably have considered potential groundwater contamination as a result of this dry well and the previous use of the site.  Indeed, when the dry well was recently sampled by EPA, CVOCs were found in the well. If Heinzman Engineering contaminated the property with CVOCs and

28

Cargill did not, as Cargill asserts, Cargill's sampling of the well during its tenure as part of permitting or lawful closure under the UIC programs would have found the contamination that much earlier and prevented, at least in part, its migration to plaintiffs' homes.

(*Avila* filing 340 & *Schwan* filing 71, pp. 27-28 (citations to record omitted).)

The plaintiffs do not cite any statute or regulation that required Cargill to report the clogged drain to the EPA or the NDEQ before filling the pit with dirt, or afterwards. Their expert merely states that the "EPA originally promulgated UIC regulations on May 19, 1980, with subsequent new and amended regulations over the next 20-plus years[,]" and that "Cargill should have notified NDEQ and/or EPA of the existence of this dry well to determine whether it needed to be regulated under the federal or state UIC regulations." (*Avila* filing 338-2 & *Schwan* filing 70-2, p. 22, ¶¶ 72, 74 (Declaration of Charles R. Dutill, II, P.E., in Opposition to Cargill, Incorporated's Motion for Summary Judgment).)[17] Without proof of such a reporting requirement, the violation of which could provide some evidence of negligence on the part of Cargill, there is no plausible need for a physical inspection of the property. In any event, the plaintiffs have not shown that they have taken any steps to obtain an inspection, such as serving a subpoena on the current property owner.

The district court does not abuse its discretion in denying a continuance and further discovery where the nonmoving party is not deprived of a fair chance to

---

[17] Mr. Dutill also conjectures that if Cargill had reported the dry well to the EPA or the NDEQ, then "one or both of these agencies could have conducted a site visit to evaluate the need for regulation of this drywell[,]" and "[o]nce onsite, the regulators could have considered previous uses of this site in light of the dry well, specifically that by Heinzman as a metal fabrication plant[,]" such that "further investigation could have been undertaken or required by one or both of the regulatory agencies" which then "could have resulted in the discovery of chlorinated solvent contamination of soil and groundwater associated with the site." (*Avila* filing 338-2 & *Schwan* filing 70-2, p. 22, ¶¶ 74, 75.)

respond to the summary judgment motion. *Nord v. Kelly*, 520 F.3d 848, 852 (8th Cir. 2008). Nor is it an abuse of discretion for a district court to grant summary judgment before the opposing party has conducted any discovery at all, even if that party has requested a continuance, if that party does not demonstrate how discovery will provide rebuttal to the movant's claims. *Alexander*, 189 F.3d at 744. "Rule 56(f) does not condone a fishing expedition" where a plaintiff merely hopes to uncover some possible evidence of the defendant's liability. *See Duffy v. Wolle*, 123 F.3d 1026, 1041 (8th Cir. 1997) (quoting *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir.1997).

The plaintiffs contend that additional discovery will help them to oppose the motions for summary judgment "by showing that (i) Cargill knew or should have known of the environmental contamination at the Engleman Road facility, (ii) that Heinzman Engineering disposed [of] or otherwise released chlorinated solvents during the period that it was a tenant to Cargill and that Cargill personnel knew or had reason to know of that disposal, and (iii) that Cargill's subsequent use of CVOCs at the site contributed to the environmental contamination emanating from the property." (*Avila* filing 340 & *Schwan* filing 71, pp. 51-52.) As discussed above, there is no evidence (1) that Cargill had actual knowledge of the environmental contamination at the Engleman Road Facility, (2) that Heinzman disposed of or otherwise released CVOCs while it was Cargill's tenant, or (3) that Cargill itself contaminated the property. There also has been no showing by the plaintiffs that there is reason to believe that any such evidence may be found in undisclosed records or from individuals who have not already been deposed.

The only remaining issue is whether Cargill had constructive knowledge of the contamination. While additional discovery might serve to reinforce the plaintiffs' position that Cargill had various opportunities to learn about the subsurface condition of the property, unless Cargill owed the plaintiffs a duty to investigate, there can be no liability for negligence or for failing to abate a nuisance. "Liability can only be predicated on a duty to inspect, as distinguished from opportunity to inspect." *Belder*

30

*v. Omaha & Council Bluffs Street Ry. Co.*, 272 N.W. 220, 222 (Neb. 1937). Because I conclude that such a duty did not exist as a matter of law in this case, the plaintiffs' request that the motions for summary judgment be denied or continued pursuant to Rule 56(f) will be denied.

## B. Negligence Claims

"The threshold inquiry in any negligence action is whether the defendant owed the plaintiff a duty. Actionable negligence cannot exist if there is no legal duty to protect the plaintiff from injury. Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular case." *Erickson v. U-Haul Int'l, Inc.*, 738 N.W.2d 453, 459-60 (Neb. 2007) (footnotes omitted). "When determining whether a legal duty exists for actionable negligence, a court considers (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution." *Id.*, at 460.

In a premises liability case, the plaintiff must establish that the defendant created the condition, knew of the condition, or by the exercise of reasonable care should have discovered or known of the condition. *Herrera v. Fleming Companies, Inc.*, 655 N.W.2d 378, 383 (Neb. 2003). With respect to persons lawfully on the premises, the Nebraska Supreme Court has held that "[a] landowner should not be held liable for defects which an investigation might reveal unless the situation suggests an investigation, and the facts indicate to a reasonably prudent man the likelihood of existence of some hidden danger[.]" *Kozloski v. Modern Litho, Inc.*, 154 N.W.2d 460, 463 (Neb. 1967); *Maxwell v. Lewis*, 186 N.W.2d 119, 122 (Neb. 1971). *See also Cook v. Lowe*, 141 N.W.2d 430, 431-32 (Neb. 1966) ("The possessor of land is subject to liability for bodily harm caused to a business invitee by a natural or artificial condition thereon if he knows, or by the exercise of reasonable care could discover, the condition, which, if known to him, he should realize as involving an unreasonable risk."). "One may not be said to be negligent because he fails to make

provision against an accident which he could not be reasonably expected to foresee." *Kozloski*, 154 N.W.2d at 463 (quoting *Anderson v. Moser*, 98 N.W.2d 703, 707 (Neb. 1959)).  In the absence of evidence to support an inference of the possessor's actual or constructive knowledge of the hazardous condition, the Nebraska Supreme Court has refused to allow the jury to speculate as to the possessor's negligence. *Richardson v. Ames Avenue Corp.*, 525 N.W.2d 212, 216 (1995).

The Nebraska Supreme Court has also repeatedly stated that "[i]n order for a defendant to have constructive notice of a condition, the condition must be visible and apparent and it must exist for a sufficient length of time prior to an accident to permit a defendant or the defendant's employees to discover and remedy it." *Id.* (finding that grocery store was not liable for spilled soap in aisle) (quoting *Benware v. Big V Supermarkets, Inc.*, 177 A.D.2d 846, 847, 576 N.Y.S.2d 461, 462-63 (1991); *Cloonan v. Food-4-Less*, 529 N.W.2d 759, 763 (1995) (finding that grocery store was not liable for icy condition of sidewalk that had been salted or cleared off); *Chelberg v. Guitars & Cadillacs of Nebraska, Inc.*, 572 N.W.2d 356, 360-61 (Neb. 1998) (finding that nightclub exercised reasonable care to discover spills); *Range v. Abbott Sports Complex*, 691 N.W.2d 525, 529 (Neb. 2005) (finding genuine issue of material fact as to whether owner of sports complex had constructive knowledge of hole made by small borrowing animal in soccer field).  A corollary to this rule is that "[w]hen a defect is latent and would not be discoverable upon a reasonable inspection, constructive notice may not be imputed." *Applegate v. Long Island Power Authority*, 53 A.D.3d 515, 516, 862 N.Y.S.2d 86, 86 (2008).

The plaintiffs argue that the applicable rule in this case is provided by Section 366 of the Restatement (Second) of Torts, which concerns the liability of a possessor of land for negligence when a person outside the premises is injured because of an artificial condition that existed when possession was taken.  The rule provides:

> One who takes possession of land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons

or property outside of the land is subject to liability for physical harm caused to them by the condition after, but only after,

      (a) the possessor knows or should know of the condition, and

      (b) he knows or should know that it exists without the consent of those affected by it, and

      (c) he has failed, after a reasonable opportunity, to make it safe or otherwise to protect such persons against it.

Restatement (Second) of Torts § 366 (1965).  Of particular interest here are the comments to clause (a):

      c. A vendee or lessee who enters into possession of land on which there is a dangerous condition created, maintained, or permitted by his predecessor does not, merely by taking possession, become liable for harm resulting from the existence or continuance of the condition to those outside of the land. . . .

      It is not, however, necessary to the liability of one who takes possession that he in fact discover the dangerous condition. It is enough that he should know of it. "Should know" is defined in § 12 as meaning that a person of reasonable prudence and intelligence, or of the superior intelligence of the actor, would ascertain the fact in question in the performance of his duty to another, or would govern his conduct on the assumption that such fact exists. Where possession is acquired voluntarily, as by purchase, lease, or the acceptance of a gift, the person taking possession is required to make reasonable inspection and inquiry as to the condition of the land. As to any defects, disrepair, or other dangers which are patent and obvious, he therefore should know of their existence at the time he takes possession. Even as to latent defects, the vendee or lessee may have enough in the way of information or warning to lead a reasonable man to investigate, so that he "should know." Where he has no such information or warning at the time he takes possession, his long continued occupation and use of the land may in itself justify the conclusion that he should have discovered the danger. For example, a possessor who has used land for years may reasonably

33

be presumed to know every condition or danger upon it, or to have failed to exercise reasonable care to investigate and discover it.

  d. In determining whether the possessor should know of a particular defect or danger, the location and condition of the land, the nature of the use or occupation, and the character of the condition or danger, all are to be taken into account. . . .  A concealed condition which is not readily discoverable in the course of the vendee's use of the land will permit a longer period of time before the possessor should know of it than one which is obvious, or which should normally be discovered in a short time.

*Id.*, comments c & d.  The commentary to Section 12 of the Restatement is also instructive:

  a. Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty. Both the phrases "reason to know" and "should know" are used throughout the Restatement of Torts in the same sense as they are used in the Restatement of Agency. (See Restatement of Agency, Second, § 9.)

Restatement (Second) of Torts § 12, comment a (1965).

  The Nebraska Supreme Court has not adopted Restatement (Second) of Torts § 366, but it has cited with approval some corresponding language from Restatement

(First) of Torts § 839, comment h (1939).  *See McKinney v. Cass County*, 144 N.W.2d 416, 422-23 (Neb. 1966) ("Restatement, Torts, s. 839, p. 306, on the subject of 'should know,' provides:  "Should know' indicates that the possessor is under a duty to the other to use reasonable diligence to ascertain the existence or nonexistence of the facts in question, and that he would ascertain the existence thereof in the proper performance of that duty.'").[18]  The Nebraska Supreme Court has also "adopted the law of nuisance as articulated in the Restatement (Second) of Torts."  *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478, 486 (Neb. 1998) (finding genuine issue of material fact as to whether owner of gasoline service station created nuisance because of leaking underground storage tanks).

Furthermore, the Nebraska Supreme Court has approved using the "reason to know" standard of Restatement (Second) of Torts § 12 for instructing a jury in a premises liability case where a tenant's cattle died after ingesting a bag of highly toxic insecticide that the landlord apparently had left on the property.  Thus, in *Krance v. Faeh*, 338 N.W.2d 55, 58-59 (Neb. 1983), the Court stated:

> "'A landlord is not liable to his tenant for any defects existing in the demised premises at the time of the lease that are perceptible to the senses or that can be discovered by reasonable inspection or examination.'" *Roan v. Bruckner*, [180 Neb. 399, 403, 143 N.W.2d 108, 111 (1966), quoting *Roberts v. Rogers*, [129 Neb. 298, 261 N.W. 354 (1935)].

> Thus, a landlord has no liability for injuries sustained as a result of dangers existing prior to the lease and which were obvious or which should have been discovered upon reasonable investigation by the

---

[18] Comment a to Section 366 states that "[t]his Section should be read together with § 839, as to liability for a private nuisance, and § 821C, as to liability for a public nuisance. Because conditions existing on land both before and after transfer, which are dangerous to those outside of the land, are normally of considerable duration, they normally create a nuisance, whether public or private." Restatement (Second) of Torts § 366 comment a (1965).

tenant. A recognized exception to this rule involves "latent defects," that is, one "'which reasonably careful inspection will not reveal; one which could not have been discovered by inspection.'" *Roberts v. Rogers, supra*, 129 Neb. at 303, 261 N.W. at 357. "A lessor's duty with respect to latent defects is only to advise the prospective lessee of any such *known* defects, not to repair them." (Emphasis supplied.) *Gehrke v. General Theatre Corp.*, [207 Neb. 301, 304-05, 298 N.W.2d 773, 775 (1980)].

This exception is set forth in Restatement (Second) of Torts § 358 at 243 (1965), as follows: "(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

"(a) the lessee does not know or have reason to know of the condition or the risk involved, and

"(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk." [19]

---

[19] A similar rule applies to vendors and purchasers. *See* Restatement (Second) of Torts § 353 (1965). While the *Krance* decision only discusses the duty of a lessee to conduct a reasonable inspection of the property, the Nebraska Supreme Court presumably would reach a comparable result in a case involving a sale of land. *See Roberts v. Rogers*, 261 N.W. 354, 356 (Neb. 1935) ("In this country the courts have generally applied the rule of caveat emptor between landlord and tenant about the same as the rule is applied between vendor and purchaser.") (quoting *Davis v. Manning*, 154 N. W. 239 (Neb. 1915) (Sedgwick, J., dissenting)). *Cf. Christopher v. Evans*, 361 N.W.2d 193, 195-96 (Neb. 1985) ("Although a vendor of real property is not guilty of fraud for failure to disclose material, latent defects which are unknown to him, where the evidence shows he was aware of circumstances from which a reasonable inference could be drawn that he either knew or should have been aware of the fact that latent, defective conditions existed, he is liable to the purchaser.").

While the rule embodied in the Restatement does not adopt an ordinary negligence standard with regard to the lessor's knowledge of the risk involved, neither does it limit a lessor's liability to situations in which he has actual knowledge of the presence of a latent, dangerous condition. Rather, the rule would impose liability for failure to disclose upon the landlord who has knowledge of facts which would lead him to conclude that an unreasonably dangerous, latent defect exists on his property. Enlightenment upon this point is provided in Comment b. to § 358 at 244: "It is not, however, necessary that the vendor have actual knowledge of the condition, or that he be in fact aware that it involves an unreasonable risk of physical harm to persons on the land. It is enough that he has reason to know that the condition exists, as that phrase is defined in § 12(1)—that is, that he has information from which a person of reasonable intelligence, or of his own superior intelligence, would infer that the condition exists, or would govern his conduct on the assumption that it does exist, and in addition would realize that its existence will involve an unreasonable risk of physical harm to persons on the land.

Based on the foregoing, it is not unreasonable to conclude that the Nebraska Supreme Court would apply Restatement (Second) of Torts § 366 in the present case. Cargill argues, however, that Section 366 is inconsistent with the line of Nebraska Supreme Court decisions which indicate that a landowner does not have constructive notice of a hazardous condition unless it is "visible and apparent" and existing "for a sufficient length of time . . . to permit a defendant . . . to discover and remedy it." *Richardson*, 525 N.W.2d at 216.  But as previously discussed, the Nebraska Supreme Court has expressly stated that a landowner can be held liable for a latent condition where "the situation suggests an investigation, and the facts indicate to a reasonably prudent man the likelihood of existence of some hidden danger[.]" *Kozloski*, 154 N.W.2d at 463.  The comments to Section 366 merely expand upon this statement by referring to "a person of reasonable prudence and intelligence, or of the superior intelligence of the actor."  As noted above, the Nebraska Supreme Court approved a "superior intelligence" instruction in *Krance*.

37

Cargill also argues that Section 366 is inconsistent with Nebraska caselaw because it suggests "that a landowner is always required to inspect its property for both 'patent and obvious' and 'latent' conditions." (*Avila* filing 343 & *Schwan* filing 74, p. 12 (Cargill's Reply Brief).)  I do not read Section 366 in this manner.  By definition, a latent condition cannot be discovered through a reasonable inspection of the property.  *See Roberts*, 261 N.W. at 357 (defining "latent defect" to mean "a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection.").  The commentary to Section 366 simply states that "as to latent defects, the vendee or lessee may have enough in the way of information or warning to lead a reasonable man to investigate, so that he 'should know.'"  In other words, there is no duty to investigate hidden conditions (as opposed to inspecting for visible and apparent conditions) unless the possessor has enough information or warning that a reasonably prudent person in his position would act.  The *Kozloski* case essentially says the same thing.  Section 839 of the Restatement, which applies to both public and private nuisances and "closely parallels § 366," also states that "[t]he possessor has a duty to inspect his premises and learn about harmful conditions on his land only when the circumstances are such that a reasonable person in his position would realize that there might be harmful conditions upon it."  Restatement (Second) of Torts § 839, comments a, i (1965).

Turning to the particular facts of this case, the plaintiffs argue that there are at least six reasons why Cargill should have known of the harmful latent condition:

> Under the factors relevant to liability pursuant to the rule stated in Section 366 of the Restatement, the summary judgment record shows that there are genuine issues of material fact regarding whether Cargill knew or should have known of the environmental contamination migrating from its former property.

> First, there is evidence that Cargill was a highly sophisticated company with substantial knowledge concerning chlorinated solvents, metal working, and waste disposal practices.  Moreover, that Cargill is

a highly diversified corporation, both with respect to the large number of companies it has and the states and countries of operation it maintains, is strong circumstantial evidence from which the trier of fact could readily infer that Cargill was knowledgeable about relevant environmental laws and regulations.

Second, Cargill purchased the former manufacturing facility from a bankrupt company for substantially less than its appraised value ($420,000 purchase price versus appraised value in excess of $650,000), and sold it almost 19 years later for less than 25% of what it had paid.

Third, there is no evidence that Cargill made any inquiry of Heinzman Engineering or its personnel regarding the environmental condition of the property, or Heinzman's waste disposal practices, either at the time of Cargill's acquisition of the property, or at any time thereafter, despite the environmental "red flags" of Heinzman's prior metal fabricating operations on the site, the on-site dumping of wastes, and the USTs. Cargill's engineer that inspected the facility before its acquisition by Cargill observed grease and oil on the concrete floor and was concerned that water could flood that floor, but apparently ignored the obvious concern of that grease and oil having washed out onto the ground with receding water.

Fourth, while Cargill in 1988 adopted an environmental policy that required its personnel to investigate past and present on and off-site waste disposal practices and other environmental risks caused by third-parties in acquiring or liquidating real property, it contained no such requirement for property that it was operating with no intent of liquidating. Why? One reasonable inference is that Cargill wanted to learn of environmental risks in acquiring and liquidating property so that it could avoid them (in acquisitions) or transfer or otherwise control them (in liquidations), but did not want to know in connection with property it was actively operating for fear of open-ended liability or interference with its on-going business use of the property.

Fifth, Cargill apparently adopted an environmental risk management policy by 1996 that included an assessment of the then-existing groundwater quality at Cargill locations. Yet Cargill has

come forward with no evidence that it investigated groundwater quality at this property, or what it found if it did perform such an investigation.

Finally, there is substantial evidence from the Seed Division's "DON'T POLLUTE" memo, the timing of Cargill's adoption of its apparently first corporate environmental policy in 1988, and in the likely unlawful manner that it handled its own spent solvents at the Engleman Road facility, that Cargill emphasized not getting caught over appropriate environmental risk management and compliance. That evidence is also relevant to whether Cargill properly managed the risk of environmental contamination on its property from Heinzman Engineering's operations, and supports a finding that Cargill knew or should have known of Heinzman's dumping and taken appropriate action to eliminate or control that risk.

(*Avila* filing 340 & *Schwan* filing 71, pp. 46-48 (citations to record omitted).)

As to the first point, I agree that the "should know" standard of care under Section 366, regarding Cargill's duty to investigate for harmful latent conditions, is based upon what a reasonably prudent person with Cargill's "superior intelligence" would ascertain the situation to be. On the other hand, the mere fact that Cargill has special knowledge and substantial resources does not create a genuine issue of material fact as to whether it was negligent in failing to discover the contamination.

Second, no adverse inference can be drawn from the fact that Cargill was able to purchase the property for less than its appraised value from a bankrupt company, nor can it be inferred that Cargill knew about the contamination when it sold the property for a fraction of what it had paid. Cargill sold its entire Seed Division, and there is no evidence that the sales price of this property was individually negotiated.

Third, the supposed environmental "red flags" were not sufficiently obvious to have required to Cargill to question Heinzman whether chlorinated solvents had been dumped on the property, or to do soil sampling. While the plaintiffs' expert states that "degreasing solvents were commonly used in the metal industry" and that

40

during the 1970's "it was fairly common for industrial facilities, particularly smaller, less sophisticated industrial facilities, to dispose of spent solvents onsite[,]" (*Avila* filing 338-2 & *Schwan* filing 70-2, p. 6, ¶¶ 17, 19), there is no evidence that Cargill knew, should have known, or even had reason to know of this "fairly common" practice.  Plaintiffs' expert merely indicates that Cargill elsewhere operated steel mills and "a water transportation unit manufacturing barges . . . [that] "probably included metal fabrication." (*Id.*, p. 5, ¶ 14.)  The only onsite dumping of wastes that Cargill knew about were the area of red paint and a scattering of debris across the property.  While the plaintiffs criticize Cargill for reporting the paint spill to the City rather than to the NDEQ or the EPA, there is no evidence of any wrongdoing in this regard, nor is there evidence that reporting the paint spill to the NDEQ or the EPA would have led to the discovery of Heinzman's dumping of chlorinated solvents.  The removal of the underground gasoline storage tanks also had nothing to do with the contamination that the plaintiffs are complaining about.  Similarly, the grease and oil stains on the concrete floor of the building were unrelated to the outside dumping of CVOCs.  In summary, the evidence establishes that Cargill inspected the Engleman Road Facility at the time of purchase for any visible and apparent defects, and later had environmental assessments performed by an outside company.  The subsurface contamination does not appear to have been discoverable by a reasonable inspection, and, in fact, one of Heinzman's employees testified that the solvents dumped on the ground were not visible after 30 minutes.  "[T]he ground was just dirt, grassy.  You wouldn't see anything." (*Avila* filing 331-11 & *Schwan* filing 61-11, p. 4 (Ivan Real deposition at 25:22-26:3 (Cargill's Ex. 10).).  The plaintiffs have failed to produce sufficient evidence that Cargill knew or should have known of this latent defect.

Finally, for their fourth, fifth, and sixth points, the plaintiffs charge that Cargill deliberately avoided taking steps to learn about the contamination during the time that it occupied the property.  Even assuming this to be true, however, no breach of duty to the plaintiffs is shown to have occurred.  "In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to

41

discharge that duty." *Eastlick v. Lueder Const. Co.*, 741 N.W.2d 628, 634 (Neb. 2007). The plaintiffs' negligence claims therefore fail as a matter of law.

### C. Nuisance Claim

A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. *Skyline Woods Homeowners Ass'n, Inc. v. Broekemeier*, ___ N.W.2d ___, 2008 WL 5101450, *15 (Neb. Dec. 5, 2008). The Nebraska Supreme Court recognizes the principles set forth in Restatement (Second) of Torts regarding nuisance. *Id.* Thus, in Nebraska,

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (1979). More particularly,

> A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
>
> (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
>
> (b) he knows or should know that it exists without the consent of those affected by it, and
>
> (c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

Restatement (Second) of Torts § 839 (1979).  Because Section 839, like Section 366, requires that the landowner know or should know of the condition, Cargill cannot be held liable on a private nuisance theory.

### III.  CONCLUSION

The plaintiffs, after having an adequate amount of time to conduct discovery, have failed to produce evidence that Cargill had actual or constructive knowledge of the contamination problem, or that Cargill caused or contributed to the problem. Summary judgment therefore will be granted in favor of Cargill on all claims.

IT IS ORDERED that:

1.   The plaintiffs' requests that Cargill's motions for summary judgment be denied or continued pending additional discovery, pursuant to Federal Rule of Civil Procedure 56(f), are denied.

2.   Cargill's motions for summary judgment  (Case No. 4:04CV3384, filing 329; Case No. 4:07CV3170, filing 59) are granted, and the plaintiffs' claims are dismissed with prejudice.

3.   Judgment shall be entered by a separate document filed in each case. With respect to Case No. 4:04CV3384, the court expressly finds that there is no just reason for delay, and directs that a final judgment shall be entered dismissing Cargill from the action pursuant to Federal Rule of Civil Procedure 54(b).

January 2, 2009.                              BY THE COURT:

                                             s/ *Richard G. Kopf*
                                             United States District Judge

43